(No. 74877

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DONALD J. WHALEN, Appellant.

*Opinion filed March 24, 1994.*

George F. Taseff, of Bloomington, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Charles G. Reynard, State's Attorney, of Bloomington (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Bradley P. Halloran, Assistant Attorneys General, of Chicago, and Norbert J. Goetten, Robert J. Biderman and David E. Mannchen, of the Office of the State's Attorneys Appellate Prosecutor, of Springfield, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

The defendant, Donald Whalen, was convicted of first degree murder in a jury trial in McLean County and was sentenced to a term of 60 years' imprisonment for the offense. The appellate court affirmed the defendant's conviction and sentence. (238 Ill. App. 3d 994.) We allowed the defendant's petition for leave to appeal (137 Ill. 2d R. 315(a)), and we now affirm the judgment of the appellate court.

Much of the evidence in this case is undisputed. Around 4:30 a.m. on April 6, 1991, an employee found the body of the murder victim, William Whalen, lying on the floor of the tavern that Whalen owned and operated in Bloomington. The victim had been beaten and stabbed, and a broken bar stool, two broken pool cues, and a number of bent knives were found near the body. In addition, bloody shoeprints containing the letters "CONS" were found on the tavern floor.

Witnesses testified that the tavern had closed around 2 or 2:15 a.m. on April 6, a Saturday, and that the victim was alone on the premises after the last customers had left. Investigators found that the tavern's two cash registers together contained about $240, consisting almost entirely of five-dollar and one-dollar bills. According to the evidence, the victim ordinarily carried

$200 or $300 in cash, and about $630 was found in his pocket following his death. No money was found in the tavern safe, which was open, though there was testimony that $450 in bills and change was regularly kept there overnight for the opening of business the next day; there was no evidence of how much money was actually in the safe prior to the murder. Other testimony indicated that the tavern would do about $800 or $900 in business on a typical Friday.

An autopsy revealed that the victim had sustained 39 blunt trauma wounds and 33 stab and incised wounds, including stab wounds to the heart and lungs. A number of these injuries by themselves would have been fatal. According to the pathologist who performed the autopsy, the causes of death were craniocerebral injuries due to blunt trauma, and multiple stab and incised wounds. The blows to the head had nearly severed one of the victim's ears.

The defendant, who was the victim's son, was arrested on May 31, 1991, and charged with the murder. In addition to the evidence summarized above, at trial the prosecution presented testimony establishing that a bloody palmprint appearing on a piece of a broken pool cue was the defendant's. The palmprint was described as a put-down impression, which signified that blood was already on the defendant's hand at the time the impression was made. Additional testing revealed that the blood on the pool cue was inconsistent with the defendant's blood type but was consistent with the victim's.

Other testimony showed that the defendant regularly wore a particular style of Converse brand shoes having distinctive soles with the letters "CONS" on them, matching the shoeprints found on the tavern floor. Moreover, an examination of the shoes taken from the defendant late in May 1991, at the time of his arrest,

nearly two months after the murder, revealed that they were the same length and width as the prints; the only difference between the two was that the defendant's shoes were excessively worn and pieces of one sole were missing. Thus, although the expert who conducted the comparisons stated that the defendant's shoes, as they appeared at the time of the examination, could not have made the prints found at the crime scene, the witness, not knowing the condition of the defendant's shoes at the time of the murder, was unable to conclude that those shoes had not made the prints.

In a statement made by the defendant to authorities in Bloomington on May 29, 1991, two days before his arrest, the defendant said that he had had a fight with his father about a month prior to the murder. The defendant also told investigators that he had previously borrowed $350 from the victim and had been trying to avoid him. In addition, the defendant said that his father had ordered him out of the family residence at some point prior to the murder, and that he returned to the home after his father's death. The defendant also stated that he had recently disposed of a pair of Converse brand shoes of the same style later taken from him by investigators.

The defendant gave a second statement following his arrest on May 31. At the time of the arrest the defendant was in a hospital in Lincoln, where he had voluntarily entered a drug rehabilitation program. On his return to Bloomington, the defendant told officers that he regularly used marijuana and cocaine, and he estimated that his drug habit cost him $100 a day.

Over the defendant's objection, the trial judge permitted the State to present evidence of a large cocaine purchase made by the defendant shortly after his father's death. The prosecution offered this testimony to support its theory that the defendant committed the

offense because he needed money to support a drug habit. Testifying under a grant of immunity, prosecution witness William Craig Elliott stated that on Wednesday, April 10, 1991, the day after the decedent's funeral, the defendant arrived early in the morning at the house where Elliott was staying, woke Elliott, and asked Elliott to go to Chicago with him to buy cocaine. The defendant told Elliott that he was carrying $5,000 in cash for that purpose and displayed a large roll of money. Elliott and the defendant drove that day to Chicago, where Elliott made contact with his supplier. The defendant provided $3,000 for the purchase, and Elliott $400. According to Elliott, the defendant paid mainly with fifty-dollar and one-hundred-dollar bills. The two returned to Bloomington and divided the drug in half. Elliott next saw the defendant a day or two later at a bar in Bloomington. On that occasion the defendant requested more cocaine, which Elliott gave to him.

To further buttress its theory that the defendant committed the murder because he needed money, the State introduced evidence showing that the defendant's parents' joint checking account saw a large increase in activity during the period between the murder, on April 6, and the defendant's arrest, on May 31. According to this testimony, the number and amounts of deposits and withdrawals were much greater in April and May 1991 than in February, March, or June of that year. The defendant did not have a bank account of his own. Colleen Whalen, the defendant's mother, testified that she provided the defendant with money during April and May, after her husband's death and before her son's arrest. Additional testimony showed that the defendant sold his car for $700 on April 29 and the family's riding lawn mower for $500 on May 28.

The defendant raised an alibi defense. In his own testimony, the defendant stated that he went to his

father's tavern around 11 a.m. on Friday, April 5, 1991. There he ate lunch, played pool, and borrowed $50 from his mother; his father was not at the tavern at that time and was not scheduled to work until that evening. The defendant stated that he left the tavern after lunch, returned around 2 or 3 o'clock in the afternoon to the house where he had been living since his father had ejected him from the family residence, and stayed at the house the rest of the day. He testified that one of his housemates, Todd Aeschleman, woke him around 1:15 the following morning, and the two then talked for a while. The defendant stated that he did not leave the premises until later that morning, when he received a telephone call summoning him to his father's tavern. The defendant also testified that he did not have a drug problem until after his father's death, and he denied purchasing cocaine with William Elliott. The defendant further testified that his father had given him a car that Christmas and that they had just gone on a hunting trip together. The defendant had been convicted of aggravated battery of a police officer in 1987 and had successfully completed a 30-month term of probation for that offense.

The two persons with whom the defendant shared a house provided testimony in support of his alibi. Todd Aeschleman stated that he returned to the house from a bar around 1 or 1:30 a.m. on April 6, 1991. The defendant was sleeping on a couch at the time. Aeschleman testified that he woke the defendant, and that the two of them talked for about 45 minutes. The defendant went to bed around 2 o'clock, and Aeschleman stayed up until 3. Aeschleman testified that he did not hear the defendant leave the house at any time during the night.

The defendant's second housemate, Pamela Hall, testified that she left the house around 8 or 8:30 in the evening on April 5. The defendant was there at the time.

Hall testified that she returned home around 3 or 3:30 the following morning. The other bedroom doors were then closed. Hall said that she next saw the defendant at 6:30 or 7 that morning, when she woke him to take a telephone call.

Additional defense witnesses stated that they had seen the defendant and his father together in the weeks preceding the murder and that the two appeared to be getting along well. The defendant's brother, Steve Whalen, and sister-in-law, Barb Whalen, testified that the defendant and his father would have disagreements but were always able to resolve them. Other witnesses testified that they saw the defendant soon after the occurrence and did not notice anything unusual about his behavior or appearance. The defendant's mother, Colleen Whalen, testified that she had recognized the defendant's drug problem but did not know whether her husband had been aware of it.

The trial judge refused to permit the defense to present testimony that, the defendant believed, was probative of another person's possible commission of the charged offense. In addition, prior to trial, the judge had granted a prosecution motion to preclude the testimony of a tardily disclosed defense expert, and the defendant had declined to request a continuance.

The jury found the defendant guilty of murder. Following a sentencing hearing, the judge sentenced the defendant to a term of 60 years' imprisonment for the conviction. The appellate court, with one justice concurring in part and dissenting in part, affirmed the defendant's conviction and sentence. (238 Ill. App. 3d 994.) The appellate court concluded that the defendant had waived any objection to the trial judge's decision to preclude the defense expert's testimony. The court rejected the defendant's two additional contentions that the judge had committed reversible error in allowing

the State to present evidence of the defendant's purchase and use of cocaine and in prohibiting the defense from presenting evidence that another person might have committed the murder. The third member of the appellate panel would have granted the defendant a new trial, agreeing with the defendant that the trial judge had erred in barring the testimony of the defendant's expert and in excluding evidence of the possible involvement of another person in the offense. (238 Ill. App. 3d at 1005-08 (Knecht, J., concurring in part and dissenting in part).) We allowed the defendant's petition for leave to appeal (134 Ill. 2d R. 315(a)). Before this court, the defendant renews these same three challenges to the trial judge's evidentiary rulings.

The defendant first contends that the trial judge committed reversible error in barring the defense from presenting the testimony of its expert witness, Ilya Zeldes. The defendant argues that preclusion of the expert's testimony was too harsh a sanction for the tardy disclosure of the expert's identity. The defendant notes that the trial judge, in barring the testimony, made no finding that defense counsel was acting willfully or blatantly, or that the State would be prejudiced by his testimony.

On November 4, 1991, defense counsel filed a supplemental discovery compliance disclosing Dr. Ilya Zeldes of Pierre, South Dakota, as a possible witness at trial. Accompanying the supplement was a copy of Zeldes' resume, which showed that Zeldes was a Russian-trained forensic scientist who had been practicing in South Dakota since 1977. The supplemental discovery compliance did not include a report from Zeldes or any other information revealing the anticipated subject of his testimony.

On November 5, 1991, the State filed a motion to bar Zeldes' testimony. Trial of the present case was

scheduled to begin the following week, on November 12, and the prosecutor contended that disclosure of the defendant's expert came too late. In her motion, the prosecutor noted that defense counsel had submitted his initial discovery compliance on September 30, 1991, two months after the deadline, and had submitted a supplemental compliance on October 12. No expert witnesses were disclosed on either occasion. In addition, the motion stated that the prosecutor had spoken to defense counsel as recently as October 28, and that counsel, without mentioning the use of any expert witnesses, said at that time that the defense case would consist of alibi witnesses and perhaps character witnesses.

At the hearing on the State's motion on November 5, defense counsel explained that Zeldes could not be retained until after the sale of the family's tavern, which had occurred only $1^1/2$ weeks earlier. Defense counsel further stated that Zeldes would testify that the palmprint on the broken pool cue was not suitable for comparison. At the conclusion of the hearing, the trial judge granted the State's motion, agreeing with the State that the disclosure of the expert was untimely.

The defendant filed a motion for reconsideration the next day. Attached to the motion was a copy of a defense investigator's summary of Zeldes' anticipated testimony. According to the summary, Zeldes believed that the bloody palmprint, as depicted in a crime laboratory photograph he had received from defense counsel, did not contain a sufficient number of characteristics to be suitable for comparison with the defendant's palmprint standards.

The motion for reconsideration was heard on November 7. At the hearing, the trial judge repeated his earlier view that defense counsel had been dilatory in disclosing the expert's identity. The judge suggested, however, that continuing the case could allow the State time to

prepare for the new witness. As the following exchange demonstrates, the defendant refused to request a continuance:

"COURT: I just—I just think that the situation here is—I can only think of one possible mitigation in this matter and that is if you want a continuance is the only possible situation we can run into.

MR. O'ROURKE [Defense counsel]: Could—If we did move for a continuance would we still be able to try it this calendar?

THE COURT: No way it can be tried this calendar with a continuance.

MR. O'ROURKE: When would the next available trial—

THE COURT: January.

MR. O'ROURKE: May I have a moment to discuss it with my client?

MR. WHALEN: Don't need a moment.

MR. O'ROURKE: My client indicates, Your Honor, that he does not desire a continuance.

THE COURT: Well, that's entirely up to you. I would afford a continuance potentially you see—

MR. O'ROURKE: I understand.

THE COURT: Seems to me that's the only way we can cure the problem we have, and even that imposes considerable difficulty on the State because they have at least an out-of-state witness that's been subpoenaed. They have a witness out of the penitentiary, don't you, that's been writted out?

MS. GRIFFIN [Assistant State's Attorney]: Yes.

THE COURT: And we have, you know, we've set aside the time for this.

MR. O'ROURKE: Could we have—Could we have one more minute?

THE COURT: Sure."

The hearing resumed after a brief recess:

"THE COURT: Okay, show for the record the Defendant and counsel are back in open court in 91—CF—344. And, Mr. O'Rourke, anything further?

MR. O'ROURKE: My client wishes to proceed to trial on the 12th, Your Honor.

THE COURT: Okay, we'll proceed 9:00 o'clock on Tuesday the 12th in this courtroom.

MR. O'ROURKE: Thank you, Your Honor."

We agree with the appellate court that the defendant cannot now complain of the judge's decision to bar Zeldes' testimony. In view of the late disclosure of the witness, the trial judge did not abuse his discretion in determining that a continuance would be necessary if the defense expert were ever to testify. Thus, in exchange for the opportunity to later offer Zeldes as a witness, the defendant was invited to request a continuance so that the State would have time to prepare for the newly disclosed witness. The defendant refused to make such a request, however, preferring instead to proceed to trial without any further delay. For this reason, we need not determine whether the judge's initial ruling barring the expert's testimony was an abuse of discretion, for we believe that the defendant effectively waived any challenge to that ruling when he later refused to request a continuance.

Moreover, we must reject the defendant's additional argument that his waiver could not be valid unless the trial judge assured him that a continuance would be granted and that the expert witness would actually be allowed to testify. As to the latter point, the trial judge was suggesting a continuance as an alternative to preclusion of the witness' testimony for the discovery violation. The judge was not being asked to resolve any issue concerning Zeldes' ultimate competence as an expert witness, and a determination of that nature certainly would have been premature at that time.

We also disagree with the defendant's further contention that the trial judge was required to assure him that a request for a continuance would be granted before an effective waiver could be made. We acknowledge that the trial judge did not state unequivocally that he would continue the matter if the defendant

asked him to do so. The trial judge was not required to provide that guarantee, however, and the defendant cannot now claim error simply because the judge failed to tell him in advance how he would rule on the request. Just as a party must ordinarily make an unsuccessful objection to preserve an allegation of error for purposes of review, the defendant in this case was required to make a motion for a continuance, the course of action was suggested by the court, before he could further challenge the preclusion of the defense witness' testimony.

The defendant also argues that the trial judge did not adequately explain to him that, by choosing to proceed to trial as scheduled, he was forgoing his constitutional right to offer the expert's testimony as a defense witness. The defendant observes that the right of an accused to present witnesses in his own behalf is a fundamental one grounded in the sixth amendment of the Constitution. U.S. Const., amends. VI, XIV; *Taylor v. Illinois* (1988), 484 U.S. 400, 408-09, 98 L. Ed. 2d 798, 810, 108 S. Ct. 646, 652-53; *Washington v. Texas* (1967), 388 U.S. 14, 17-19, 18 L. Ed. 2d 1019, 1022-23, 87 S. Ct. 1920, 1922-23.

Without determining here whether an express admonition to that effect is necessary in the circumstances present in the case at bar, we conclude that the defendant understood the nature of the choice he was making and voluntarily elected to forgo any later opportunity to offer the witness' testimony. In the colloquy with defense counsel, the trial judge clearly stated that the defense witness could be allowed to testify only if the case was continued. In addition, from the attorneys' references to the relevant case law on witness preclusion, including *Taylor,* the defendant would have realized the constitutional basis of his right to present exculpatory evidence. Finally, we note that the defendant consulted with

defense counsel before making his decision. As the transcript reveals, the defendant simply did not want to wait any longer before going to trial. When the issue came up during the hearing on the defendant's post-trial motion, defense counsel explained:

"Briefly in response, your Honor, as far as Mr. Whalen not [ac]cepting a continuance I think when a person is in custody that creates pressure for a person not to allow the case to be delayed any further than it already had been. So I don't think that can cure the error on that."

On this record, then, we conclude that the defendant's determination to proceed to trial without further delay was knowing and voluntary.

The defendant next argues that the trial judge erred in overruling the defense objection to William Elliott's testimony and in permitting the prosecution to introduce this evidence of the defendant's purchase and use of cocaine. The defendant maintains that the testimony was irrelevant and prejudicial. In addition, the defendant contends that the evidence of his possession of a large sum of money, if relevant to this case, could have been presented without any reference to illicit drug use.

The prosecution may introduce evidence of other misconduct committed by a defendant if the testimony is offered for a purpose other than simply to establish the defendant's propensity to commit crime, and if the probative value of the evidence outweighs its risk of unfair prejudice. (*People v. Maxwell* (1992), 148 Ill. 2d 116, 130; *People v. McKibbins* (1983), 96 Ill. 2d 176, 182; *People v. Lehman* (1955), 5 Ill. 2d 337, 342-43.) Thus, in an appropriate case, evidence of uncharged misconduct may be admitted to show *modus operandi*, presence, identity, motive, intent, or other material fact. (*People v. Kokoraleis* (1989), 132 Ill. 2d 235, 256; *People v. Stewart* (1984), 105 Ill. 2d 22, 61-62.) A ruling by the trial judge allowing the introduction of such evidence will be upheld on appeal unless it constitutes an abuse of

discretion. *People v. Illgen* (1991), 145 Ill. 2d 353, 364; *People v. Phillips* (1989), 127 Ill. 2d 499, 522.

We do not believe that the trial judge abused his discretion in admitting Elliott's testimony. We agree with the State that the evidence was relevant to the defendant's intent and motive. At trial, the prosecution theorized that the defendant committed the murder so that he could obtain money with which to buy drugs. Following the commission of the offense, investigators found that the tavern cash registers contained only one ten-dollar bill, and no larger denominations, and that the tavern safe was empty of money. This evidence clearly supported the inference that the offender took money from the safe and took part of the day's proceeds from the cash registers. Testimony relating the defendant's subsequent purchase and use of drugs was, of course, relevant to the prosecution theory that the defendant committed the offense so that he could obtain drugs. For these reasons, we conclude that the evidence of the defendant's drug purchase and related activity was relevant to the present prosecution.

In addition, we cannot say that the probative value of the evidence was outweighed by its risk of unfair prejudice to the defendant. The jurors received an instruction on the limited purposes for which this testimony had been introduced, and they were told to consider the evidence only as proof of the defendant's "intent and motive." (See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (2d ed. 1981).) As this court has stated, the admissibility of such evidence is a question reserved to the sound discretion of the trial judge. (*People v. Illgen* (1991), 145 Ill. 2d 353, 364; *People v. Phillips* (1989), 127 Ill. 2d 499, 522.) In the circumstances presented here, we find no abuse of discretion.

As a final matter, the defendant contends that the trial judge improperly excluded testimony that another

person might have committed the crime charged here. Specifically, the defendant argues that the judge erred in barring the defense from presenting testimony that Robert McElvaney, a regular patron of the tavern, might have been responsible for the victim's murder.

In an offer of proof, the defendant presented testimony from McElvaney and a police officer. The officer testified that he and another officer questioned McElvaney at his residence around 7 a.m. on April 6, several hours after the murder was discovered, and before any information about the case had been made public. The officer stated that, after being told there had been a disturbance at the tavern, McElvaney replied, "I wouldn't hurt Bill Whalen. Bill Whalen is my buddy. What did I do?" The officer also stated that McElvaney was dressed at the time, despite the earliness of the hour.

McElvaney testified that the victim had ejected him from the tavern around 7:30 p.m. on April 5. McElvaney stated that he was a regular patron of the victim's bar and that it was not unusual for the victim to ask him to leave. McElvaney further testified that he did not argue with the victim when he was ejected on April 5 and, in fact, told the victim that he would see the victim the next day. With regard to his comment to the police officers, McElvaney explained that he thought that the officers had heard of the preceding evening's incident.

The defendant also notes that a Pabst Blue Ribbon beer can was found on the floor after the murder and that McElvaney's regular drink at the bar was Pabst Blue Ribbon beer. The defendant contends that the evidence described above shows that McElvaney had both a motive to commit the murder and the opportunity to do so.

It is well established that an accused may offer evidence tending to show that the offense charged was committed by someone else. (*People v. Howard* (1991),

147 Ill. 2d 103, 143; *People v. Nitti* (1924), 312 Ill. 73, 90; *Synon v. People* (1901), 188 Ill. 609, 627.) Such evidence is properly excluded, however, if it is remote or speculative. (*People v. Ward* (1984), 101 Ill. 2d 443, 455-56; *People v. Dukett* (1974), 56 Ill. 2d 432, 450.) In the case at bar, we find no abuse of discretion in the judge's decision to exclude the defendant's evidence concerning McElvaney's possible involvement in the murder. The link between McElvaney and the offense was speculative at best. The testimony showed that McElvaney was a regular customer at the tavern and that he and the victim were on friendly terms. Although McElvaney drank the same kind of beer as the brand of a can found at the crime scene, there was no evidence, as the appellate court noted, that McElvaney's fingerprints were on the container. Finally, even if it was not McElvaney's habit to be awake and dressed at 7 o'clock in the morning, we do not consider that circumstance to be of particular import; there is nothing inherently incriminating in rising early on occasion. The evidence presented by the defendant in his offer of proof demonstrated no more than that McElvaney recalled the incident of the preceding evening and, when informed that there had been a disturbance at the bar, simply wished to dispel any suspicion from himself.

For the reasons stated, the judgment of the appellate court, affirming the judgment of the circuit court of McLean County, is affirmed.

*Judgment affirmed.*