THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL BENNETT, Defendant-Appellant.

First District (6th Division)   No. 1—94—2001

Opinion filed June 7, 1996.

815

Michael J. Pelletier and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E.

Fitzgerald, and Mari R. Hatzenbuehler, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

A jury convicted the defendant, Michael Bennett, for the armed robbery of a McDonald's restaurant at 1117 West Howard in Evanston on July 28, 1991. The judge sentenced the defendant to 26 years in prison.

After the police arrested the defendant on September 2, 1991, the State charged him with the July 28 armed robbery of the McDonald's and with the August 17, 1991, armed robbery of a Toys R Us Store. The grand jury also indicted Peter DelSol for the armed robbery of the Toys R Us. The proceedings on the Toys R Us armed robbery charges were separate from those on the McDonald's armed robbery charges, and it is only the defendant's conviction for the armed robbery of the McDonald's that is before us.

Before the defendant's trial on the McDonald's armed robbery charges, the defense filed a motion *in limine*, in which it asked the judge to prevent the State from introducing evidence of the Toys R Us robbery. The judge denied this motion on the condition that the evidence at trial support the admission of the Toys R Us armed robbery as evidence of a *modus operandi*. During the trial, the judge stated that the evidence of the Toys R Us armed robbery was admissible as evidence of a common scheme, *modus operandi* and identification because of similarities between the two robberies.

Jose Delcid testified that he was a first assistant manager at a McDonald's restaurant at 1117 W. Howard in Evanston. On July 28, 1991, he and the three crew members working with him, Otto Hernandez, Malcolm Watson and Christopher Thomas, were performing their post-closing tasks in the restaurant, which had closed at 11 p.m. Delcid locked the doors and looked into the bathrooms, but he did not look into the stalls in the women's bathroom. After Delcid returned to his office, Thomas asked him to call the police because there was a customer who was refusing to leave the restaurant.

Delcid did not call the police but went with Thomas to speak to the customer. He saw the defendant hiding behind some garbage cans near the bathrooms. The defendant had a bag in one hand and small caliber eight-inch silver gun in the other. He was wearing maroon sweatpants, a dark sweatshirt and yellow dish gloves that were missing the fingertips. The defendant ordered Thomas and Delcid to sit. When Watson and Hernandez exited the kitchen, the defendant ordered them to sit with Delcid and Thomas. The defendant then forced Thomas, Watson and Hernandez into the store freezer and ordered Delcid to place a lock on the freezer door.

The defendant took Delcid, who was the only employee wearing a tie, to the restaurant safe. When Delcid had difficulty opening the safe, the defendant told him to hurry. After Delcid opened the safe, the defendant placed money and gift certificates from the safe into his bag. A second person then entered the restaurant. This person was wearing a white towel covering his face and hair.

After the second person entered the restaurant, Delcid heard the restaurant alarm, from which he concluded that the crew had escaped the freezer through a side door. Upon hearing the alarm, the second person ran from the restaurant. The defendant then forced Delcid to empty the cash drawers in the restaurant. When Delcid did not do so as quickly as the defendant would have liked, the defendant raised his gun and pointed it at Delcid. Delcid emptied the drawers, and the defendant left the restaurant. Shortly thereafter, the police arrived.

Delcid provided the police with a composite sketch of the robber. The day after the robbery, he selected a photograph from a book of photographs the police showed him, and he told the police that he thought the person in the photograph was the robber. The person in the photograph was David McCoy. When he saw McCoy in a lineup on July 29, Delcid told the police that he was not sure that McCoy was the robber. He said that he was 70% sure that McCoy was the robber. On September 3, 1991, the police showed Delcid another lineup. As soon as he saw the defendant in this lineup, he told the police, "[T]hat's it. You got him." He told the police that he was 100% sure the defendant was the one who robbed the McDonald's.

Christopher Thomas testified that he was working as a crew member at the Howard Street McDonald's in Evanston on July 28, 1991. After closing, he cleaned the men's bathroom and then entered the women's bathroom to clean it. He saw the defendant sitting in one of the stalls. The defendant asked to stay in the restaurant for a few minutes because he had nowhere else to go.

Thomas went to Delcid's office and told Delcid that a customer was refusing to leave the store. When he and Delcid returned to the bathroom area, they saw the defendant next to the exit near the bathrooms. He was wearing a black sweatshirt, red jogging pants, rubber gloves and a large blue pouch. He was holding a silver handgun.

Thomas admitted he was wearing a house arrest band or bracelet at the time of the robbery. He was wearing a bracelet while a robbery charge was pending against him. He later pleaded guilty of robbery and was placed on probation. He was on probation at the time he testified. He was never shown a photograph of the defendant and he never viewed a lineup containing the defendant. His house-arrest

bracelet broke and fell off his wrist when he was escaping from the freezer, and, as a result, the police arrested him the next day. He was angry with the police because they arrested him and did not want to cooperate. He identified no one in the lineup the police showed him on July 29.

Malcolm Watson testified that he was working as a cook on the night of the robbery. After closing, he left the kitchen to use the bathroom and saw the defendant with Delcid and Thomas. He described the defendant as wearing "bummy looking clothes" turned inside out. The defendant was wearing black jogging pants, a red sweatshirt and latex gloves and was holding a small black gun with a silver finish.

Watson explained that he, Thomas and Hernandez escaped from the freezer through an unlocked delivery door. After leaving the restaurant, they told people in a nearby Dairy Queen store to call the police.

The next day, Watson looked at books of photographs at the police station, but he saw no pictures of the robber. The robber was also not in a lineup the police showed him on July 29. In the lineup the police showed him on September 3, 1991, however, he identified the defendant as the robber. Two weeks before the lineup, Watson had seen the defendant on the street. Sometime before viewing the lineup on September 3, he told Detective Mark Kostecki that he had seen the defendant on the street.

Hernandez's testimony was essentially the same as Watson's, but he added that he had seen the defendant in the restaurant prior to closing. At that time, the defendant was dressed in a nice shirt and pants, and he bought food in the restaurant. When he saw the defendant after closing, the defendant was wearing old clothes.

The day after the robbery, he picked a photograph from books of photographs the police showed him. He told the police that the person in the photograph, David McCoy, might be the robber, but McCoy had lighter skin than the robber. He saw McCoy in a lineup that same day and told the police that McCoy looked like the robber but was shorter and had lighter skin. He was unable to attend the lineup in September, but the police showed him an array of photographs that included a picture of the defendant. He selected this picture and told the police that the man in the picture was the man who robbed the restaurant.

Evanston Police Department Detective Mark Kostecki testified that, immediately after the robbery, Delcid told him the robber had been wearing a black T-shirt or sweatshirt and red jogging pants turned inside out. The day after the robbery, the police showed the

four McDonald's employees a lineup that included David McCoy, whom some of the employees had tentatively identified from a photograph. After viewing the lineup, Delcid said that McCoy might have been the robber, but the other employees stated that the robber was not in the lineup. Delcid said that he was 70% sure McCoy was the robber.

On September 2, 1991, the Evanston police arrested the defendant in connection with the August 17, 1991, robbery of a Toys R Us store. They placed the defendant in a lineup. When Delcid and Watson viewed this lineup, they immediately identified the defendant as the person who had robbed the restaurant. It was not until the day of this lineup that Watson told him he had seen the defendant on the street. Hernandez immediately identified the defendant from a photograph the police showed him. After the police informed the defendant that the McDonald's employees had identified him, the defendant said, "I really fucked up my life now."

The State also presented evidence of the Toys R Us robbery through several witnesses. Dan Palumbo, the manager of the Toys R Us at Dempster and Dodge in Evanston, testified that he was scheduled to work until the store closed at 9:30 p.m. on August 17, 1991. At 8:30 p.m., he went to use the men's bathroom and saw the defendant sitting on a toilet in one of the stalls. The defendant was wearing a gray sweatshirt and maroon sweatpants. Although he was sitting on the toilet, he was fully dressed. Embarrassed, Palumbo exited the washroom. Twenty minutes later, he saw the defendant in an aisle of the store.

After closing, he heard running and saw two men with a maintenance employee. One of the men was holding a small silver gun against the maintenance employee's neck. The two men were wearing scarves that covered their faces except for their eyes. Palumbo also saw the defendant hiding behind a ticket writer in the store. The defendant was wearing a scarf covering his eyes, but Palumbo recognized him by his build and by his maroon pants.

One of the two men holding the maintenance man pointed a shotgun at Palumbo and took him and other employees to a maintenance closet in the store. When they placed Lillian Wright, another employee, in the closet, she was dazed, and her face was bruised. The robbers took Palumbo out of the closet to open the store safe. (He was the only employee wearing a tie.) After they emptied the safe, Palumbo heard the robbers breaking into the area containing video games such as Sega and Nintendo. The robbers took $4,000 in cash, the video games and $3,000 in "Geoffrey money," which is Toys R Us store credit. During the robbery, he did not see the defendant with a

weapon and did not remember noticing that he was wearing gloves. In a lineup he saw in September 1991, he identified the defendant and told the police he was 75% to 80% sure that the defendant was the person he saw in the bathroom and the store aisle. Wright testified that, after the store closed, she was working at a cash register when she heard a voice say, "This is a robbery." She looked up and saw two men wearing masks and latex gloves. One had a knife and both had guns. One of the guns was a little silver handgun. One of the men hit her in the mouth and knocked her unconscious. She did not know whether the defendant was one of the men she saw and did not remember anything after one of the robbers hit her in the mouth.

According to State police witnesses, the police recovered part of a rubber glove on the floor near a cash register in the Toys R Us. The part they recovered consisted of the fingers and part of the palm area of the glove. They also found fingerprints that matched those of the defendant at the top of one of the stall doors in the men's bathroom. There was dirt and mud on the toilet seat of this stall.

Sherman Jefferson, the manager of the Riverview Toys R Us at Belmont and Western in Chicago, testified that he was aware that robbers had taken "software merchandise *** [l]ike Sega game [player] cartridge[s and] Nintendo" and "Geoffrey money" from the Evanston Toys R Us. On August 29, 1991, the defendant and another person attempted to return two Sega game players. Jefferson allowed him to return only one of the game players because it was unusual for someone to ask to return two of the same item. The defendant completed a return slip, on which he provided his correct name and address, and he showed Jefferson a school identification card from North Park College.

Jefferson gave the defendant $160 in Geoffrey money in exchange for the returned game player. The defendant then selected items seemingly at random from the store shelves without checking any of the prices. He paid for these items with about $300 to $400 of Geoffrey money and appeared to have another $100 to $200 of Geoffrey money remaining in his possession. After the defendant left, the store manager called the police, and Jefferson identified the defendant from a North Park yearbook photograph the police showed him.

Evanston Police Department Detective Patrick Lenart testified that, during his investigation of these robberies, he discovered that fingerprints on the Sega game returned to the Riverview Toys R Us matched the defendant's. Before arresting the defendant, the police interviewed Peter DelSol. When the police arrested the defendant, they informed him that DelSol had implicated him in the Toys R Us

robbery. The defendant initially denied participation in and knowledge of this robbery. He stated that he had bought the Sega game on the street, but had no explanation for his possession of the Geoffrey money. The defendant also denied his participation in the McDonald's robbery, but, after Lenart told him that McDonald's and Toys R Us employees had identified him, he stated that he had "messed up his life" and was just trying to help his friends the DelSols.

When Lenart asked the defendant if he had committed the robberies, the defendant nodded affirmatively. When asked whether he had a knife in the Toys R Us robbery, the defendant responded only that he did not have the gun. He described the gun used in the Toys R Us robbery as a small silver .38-caliber gun. The defendant then asked to speak to his mother. In the presence of his mother, he denied any involvement in the robberies, but he later admitted to Lenart that he had lied to his mother.

Peter DelSol testified that, at the time of trial, he was serving a prison sentence for the Toys R Us robbery. In exchange for a six-year sentence, he had agreed to admit his involvement in the Toys R Us armed robbery. He had committed this robbery with the defendant and another person. (In another part of his testimony, he stated that only he and the defendant had committed the robbery.)

Before the store closed, they hid in the store. He did not know where the defendant hid. He and the defendant were wearing shirts over their faces. DelSol was wearing black leather gloves, but he could not remember what type of gloves the defendant was wearing. It was a "possibility" that the defendant was wearing yellow rubber gloves. They used a shotgun and a small white shiny handgun that the defendant had provided. The defendant had some sort of weapon, but he was not sure whether it was a knife or a gun. During the robbery, he saw the defendant carrying a female store employee. DelSol admitted that, on April 24, 1992, he had signed an affidavit, in which he had stated that all of the statements he had made against the defendant were false.

After this testimony, the State rested. The defendant did not testify, but he presented the testimony of other witnesses. In the defendant's case, Officer Lenart testified that he interviewed Lillian Wright after the robbery. She was on medication and had stitches in her mouth when he talked to her. He did not remember her telling him that the robbers were wearing yellow latex gloves and there was nothing in his report from this interview about gloves. Officer Kostecki testified that Delcid had told him the robber was wearing red pants that were turned inside out and a T-shirt with holes in it.

The defendant called several other Evanston police officers to

testify. One stated that, in making composite sketches of the robber, Delcid, Watson and Hernandez had all selected different features, but this was not unusual. Another stated that Watson had told him that the robber had two gold earrings in each ear and was wearing a black T-shirt turned inside out and red jogging pants. Another officer testified that, when Delcid selected David McCoy's photograph from the mug shot books, he stated that he was sure the person in the photograph was the robber.

The defendant also presented the testimony of several alibi witnesses. His sister, Sharon Labrone, testified that, in July 1991, she was living with her daughter, her mother, and her sister. Her brother also came to live with them after he was arrested on July 25 for a fight with his girlfriend, Marsha Dean. On July 28, the defendant was at his mother's home all day. Pedro Rodriguez, the defendant's mother's boyfriend, was also there until 10 p.m. From 9 p.m. to 11 p.m., the defendant was in his mother's room talking to his mother alone. Rodriguez was in the living room with Sharon. After 11 p.m. the defendant was in Sharon's room talking to her until she went to bed at 1 a.m.

Rodriguez testified that he was at the defendant's mother's home from noon to about 10:30 p.m. on July 28. He had gone there to give the defendant advice about an insurance claim. He talked to the defendant for about an hour when he first arrived. At 10 p.m., he watched the evening news with the defendant's mother. During this time, the defendant was listening to music in his room.

The defendant's mother, Yvonne Bennett, testified that, at 9 p.m. on July 28, 1991, the defendant was speaking to Rodriguez in the dining room. About 15 or 20 minutes after Rodriguez left, the defendant came to her room to talk to her and stayed there until 11:30 p.m. or midnight, when she went to bed. Sharon was in her own room from 11 p.m. to midnight.

On rebuttal, the State presented a stipulation that the defendant, while serving as his own attorney, had filed a notice of alibi, in which he asserted that, on July 28, 1991, he was at the residence of his girlfriend, Marsha Dean, babysitting her child. On surrebuttal, Yvonne Bennett testified that, on August 17, 1991, Marsha Dean and her son had visited her while babysitting Dean's child.

The jury found the defendant guilty of armed robbery, and the judge sentenced the defendant to 26 years' imprisonment.

The defendant argues that he was denied a fair trial because the judge refused to remove his shackles during trial. On the morning of the second day of trial, the defense asked the judge for permission to have the defendant's shackles removed. The defense argued that the

defendant was not an escape risk. The judge denied this request, however, because, he said, the courtroom was unsecured. He explained that there was no lock-up facility next to the courtroom so the defendant had to be transported to the courtroom from another part of the courthouse. The judge also stated that the jury could not see the shackles. He said that he would consider the defense request to remove the shackles if the trial were moved to another courtroom, if the defendant decided to testify or if the shackles became "unwieldy." The record does not indicate whether the defendant wore shackles during the trial on any day other than the second day.

The State argues that the defendant waived this issue by failing to object during trial and by failing to raise the issue in his post-trial motion. The State correctly asserts that, generally, a defendant waives an issue for review if he fails to object at trial or fails to include the issue in his post-trial motion. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988). Given the defense attorney's request at trial to have the defendant's shackles removed, we cannot accept the State's assertion that the defendant failed to object to the shackles at trial. The defendant did waive this issue, however, by failing to include it in his post-trial motion.

Nevertheless, the defendant urges us to review this issue under the plain error exception to the waiver rule. The State contends that there was no plain error because there is no evidence in the record that the jury saw the shackles.

A reviewing court will review an issue under the plain error doctrine if the evidence is closely balanced or if the alleged error was so serious that it deprived the defendant of a fair trial. *People v. Blackwell*, 164 Ill. 2d 67, 646 N.E.2d 610 (1995) (finding that gender discrimination in juror selection was plain error because it denied the defendant a fair trial). We must, therefore, determine whether the judge's refusal to remove the defendant's shackles deprived the defendant of a fair trial such that it was plain error.

In *People v. Boose*, 66 Ill. 2d 261, 362 N.E.2d 303 (1977), the supreme court explained the circumstances under which a judge could refuse a defendant's request to have his shackles removed. The court held that a trial judge had abused his discretion in refusing a defense motion to have the defendant's shackles removed during trial. The judge had denied the motion on the basis that the defendant was on trial for a violent offense.

The *Boose* court explained that shackling should be avoided, if possible, because "(1) it tends to prejudice the jury against the accused; (2) it restricts his ability to assist his counsel during trial; and (3) it offends the dignity of the judicial process." *Boose*, 66 Ill. 2d at

265. The court noted, however, that a defendant may be shackled if there is a manifest need for the shackling, such as reason to believe the defendant might escape, a threat to the safety of the occupants of the courtroom or the need to maintain order in the courtroom. Whether shackles are necessary is a determination within the discretion of the trial judge, but the judge should state for the record his reasons for shackling the defendant. Among the factors a judge should consider in deciding whether to require shackles are the seriousness of the charge against the defendant; the defendant's temperament; his past record; his past escape efforts and plans to escape or cause a disturbance; the risk of attempted revenge or rescue by others; the nature of the security of the courtroom; and the availability of alternative methods for addressing these issues. *Boose*, 66 Ill. 2d at 266-67.

The *Boose* court determined that the judge had abused his discretion in refusing to remove the defendant's shackles because the only reason the judge gave to justify his ruling was the nature of the defendant's offense. This reason, by itself, was insufficient, and there was no evidence in the record supporting the shackling under the other factors the court had provided. *Boose*, 66 Ill. 2d at 267.

In a subsequent case, *In re Staley*, 67 Ill. 2d 33, 364 N.E.2d 72 (1977), the supreme court decided that "poor security" in the courtroom also did not, by itself, justify shackling the defendant. The defendant had prevented juvenile home officials from coming to the rescue of a teacher whom another resident was beating. The court denied a defense motion to have the defendant's handcuffs removed during an adjudicatory hearing because of "poor security" in the courtroom. *Staley*, 67 Ill. 2d at 35.

The *Staley* court rejected the State's argument that the shackling was harmless because there was no jury at the adjudicatory hearing. The court said that the reasons for prohibiting shackling are not limited to jury trials:

> "The presumption of innocence is central to our administration of criminal justice. In the absence of exceptional circumstances, an accused has the right to stand trial 'with the appearance, dignity, and self-respect of a free and innocent man.' [Citation.] It jeopardizes the presumption's value and protection and demeans our justice for an accused without clear cause to be required to stand in a courtroom in manacles or other restraints while he is being judged. Also, as we observed in *Boose*, shackling restricts the ability of an accused to cooperate with his attorney and to assist in his defense." *Staley*, 67 Ill. 2d at 37.

The court concluded that, absent a clear showing on the record

that shackling was necessary to preserve the order in the courtroom, prevent the defendant's escape or protect the people in the courtroom, it was improper in a bench or jury trial. The court concluded that there was no such showing in the case before it. As for the trial judge's stated concern about the security of the courtroom, the court commented: "While the record is not absolutely clear as to the status of the security in the courtroom, we consider that if guards or deputies were not present, they should have been summoned in order to resolve the security problem." *Staley*, 67 Ill. 2d at 38.

■ Based on these cases, we judge that it was plain error for the judge in this case to deny the defense request to have the defendant's shackles removed. As in *Staley*, the only reason the judge gave for refusing the defense motion related to the security of the courtroom. Under *Staley*, this reason alone is insufficient to support the judge's ruling, and the record does not "clearly show" that the shackles were necessary for any other reason. There is no evidence that the defendant was an escape risk or posed a threat to the occupants of the courtroom.

We also note that the *Boose* court held that one of the factors a judge should consider in deciding whether shackles are necessary is the availability of alternatives. The judge in this case stated that the shackles were necessary because the defendant had to be transported to the courtroom through the courthouse. While this may be true, it does not explain why the shackles could not have been removed when the defendant arrived in the courtroom and replaced when he left the courtroom. Based on the record, this seems to have been an available alternative to requiring the defendant to be shackled during trial.

The State argues that the defendant suffered no prejudice from the shackling because the judge stated that the jury could not see the shackles. The *Boose* and *Staley* holdings, however, were not dependent on the jury's awareness of the shackles. In fact, the *Staley* court rejected this argument. Even though there was no jury in that case, the *Staley* court decided it was reversible error to shackle the defendant on the sole basis that there was "poor security" in the courtroom.

In support of its argument that it was not error to shackle the defendant during trial because the jury was not aware of the shackles, the State cites *People v. Stewart*, 161 Ill. App. 3d 99, 514 N.E.2d 51 (1987). Although the court in *Stewart* found that any error in shackling the defendant was harmless because there was no indication that the jury was aware of the shackles, we think *Stewart* is distinguishable from the case before us. In *Stewart*, there was evidence

that the defendant had stated before trial that he would not be taken from the courtroom alive. *Stewart*, 161 Ill. App. 3d at 101. Like *Stewart*, and other cases in which courts have held that shackling a defendant during trial was proper, there has been evidence that the defendant was an escape risk or was likely to cause a disturbance in the courtroom. See, *e.g., People v. Henderson*, 223 Ill. App. 3d 131, 583 N.E.2d 1187 (1991) (the judge had determined that the defendant posed an escape risk and a threat to the safety of courtroom occupants); *People v. McCue*, 175 Ill. App. 3d 762, 530 N.E.2d 271 (1988) (a defendant had four prior escape attempts); *People v. Whitson*, 127 Ill. App. 3d 999, 470 N.E.2d 1054 (1984) (a previous courtroom disruption by the defendant and his codefendant had necessitated the use of teargas). By contrast, there was no indication that the defendant in this case was an escape or safety risk.

Moreover, based on the supreme court's decision in *Staley*, we cannot rest our resolution of the defendant's argument on the jury's awareness of the defendant's shackles. We hold, therefore, that it was reversible error for the judge to refuse the defense motion to have the defendant's shackles removed during trial.

We judge that the shackling issue alone warrants the defendant's reversal. We will, however, address his argument that the judge improperly admitted evidence of other crimes because this issue may arise again if the State retries the defendant for the armed robbery of the McDonald's.

The defendant argues that he was denied a fair trial by the admission of "irrelevant details concerning an unrelated offense." Specifically, the defendant asserts that it was error for the judge to allow Lillian Wright's testimony that one of the robbers struck her in the mouth with a gun and knocked her unconscious.

Before Lillian Wright testified, the judge asked the State how her testimony was relevant. The judge accepted the State's explanation that her testimony was relevant because she would testify that, like the McDonald's robber, the Toys R Us robbers wore gloves and used a silver gun. The judge ruled that her testimony would be admissible for the limited purpose of showing a common scheme, identification and *modus operandi*. The defendant contends that her testimony that one of the Toys R Us robbers struck her in the mouth was irrelevant and unduly prejudicial, and the remainder of her testimony was cumulative of the testimony of other witnesses.

■ Evidence of other crimes in which the defendant participated is admissible for any relevant purpose. *People v. Coleman*, 158 Ill. 2d 319, 633 N.E.2d 654 (1994). Among the purposes for which such evidence is admissible are *modus operandi*, identity, motive, intent or

absence of mistake. *People v. Illgen*, 145 Ill. 2d 353, 583 N.E.2d 515 (1991). A reviewing court will uphold the trial judge's determination concerning the admissibility of other crimes evidence, absent an abuse of discretion. *People v. Whalen*, 158 Ill. 2d 415, 634 N.E.2d 725 (1994).

■ In order to establish the admissibility of another crime under the *modus operandi* exception, it is sufficient if there are distinctive links, such as using similar weapons, wearing similar clothes, committing the offenses with the same number of people and using a distinctive method of committing the offense. *People v. Phillips*, 127 Ill. 2d 499, 538 N.E.2d 500 (1989). In this case, there were numerous distinctive links between the McDonald's robbery and the Toys R Us robbery. In addition to the fact that these robberies occurred in the same city within three weeks of each other, there was testimony that, in both crimes, there was more than one offender involved. Like one of the offenders in the Toys R Us robbery, one of the McDonald's robbers entered the business before closing and hid in a bathroom stall before closing. After closing, offenders in both crimes forced store employees at gunpoint into an enclosed area of the store, forced the store manager to open the store safe and took cash and gift certificates. In addition, there was testimony that the offenders in both crimes partially covered their faces with cloth and used a small silver handgun. One of the Toys R Us and McDonald's robbers wore black and reddish exercise clothes and yellow rubber latex gloves with pieces cut from them. Based on these shared particular features, we believe that evidence of the Toys R Us robbery was admissible as evidence of *modus operandi*.

A trial judge, however, must limit evidence of other crimes to that evidence which is relevant to the purpose for which the other crime is admitted. *People v. Miller*, 254 Ill. App. 3d 997, 626 N.E.2d 1350 (1993). Evidence is relevant if it tends to make the existence of any material fact more or less probable than it would be without the evidence. *People v. Johnson*, 255 Ill. App. 3d 547, 626 N.E.2d 1073 (1993).

■ We disagree with the defendant's assertion that Wright's testimony should have been excluded because it was cumulative. She was the only witness to the Toys R Us robbery who testified that the robbers wore latex gloves and used a small silver gun. DelSol could not remember what sort of weapon the defendant had or whether the defendant was wearing yellow rubber gloves. Palumbo did not see the defendant with a weapon and did not remember him wearing gloves. Wright's testimony that the defendant was wearing latex gloves and holding a small silver handgun, therefore, was critical to

connect the Toys R Us robbery to the McDonald's robbery, in which the robber wore yellow rubber gloves and held a small silver handgun. Her testimony concerning these facts was admissible to show a *modus operandi.*

We agree with the defendant, however, that Wright's testimony that one of the robbers knocked her unconscious was inadmissible. It was not relevant to the purpose for which evidence of the Toys R Us robbery was admitted, to show a *modus operandi.* The prejudicial effect of the evidence of violence toward Wright outweighed its probative value.

We caution, however, that the defendant may "open the door" for the testimony concerning Lillian Wright's injury by introduction of Officer Lenart's testimony in an attempt to impeach Lillian Wright. Lenart testified that he did not remember Lillian Wright telling him that the robbers were wearing yellow latex gloves. The State should be able to explain what Lillian Wright's condition was and what caused it to explain why her memory might not have been as good when she spoke to the police officer.

We also believe that the State introduced too many details of the Toys R Us offense. We recognize that when the State seeks to establish the *modus operandi* exception, it is necessary to establish more specifics of the second offense. But the State established those specifics with the testimony of Palumbo, Wright and the corroboration by Jefferson. In our judgment, it was unnecessary to show that the defendant's fingerprints were found at the Toys R Us store or that he confessed. It was also unnecessary to call an accomplice witness to testify to all of the aspects of the Toys R Us robbery. In effect, the prosecution "was allowed to put on a trial within a trial," a practice which has been condemned. See *People v. Bartall*, 98 Ill. 2d 294, 315, 456 N.E.2d 59 (1983); *People v. McKibbins*, 96 Ill. 2d 176, 187, 449 N.E.2d 821 (1983).

In the event of a subsequent trial of the defendant for the McDonald's armed robbery, testimony concerning the Toys R Us robbery should be limited to that necessary to show a *modus operandi.* Unless it is determined to be relevant for another purpose or introduced by the defense, testimony concerning Wright's injuries in this robbery should be excluded.

At a new trial, we believe the trial judge should instruct the jury after oral argument rather than before (*cf. People v. Fox*, 177 Ill. App. 3d 602, 532 N.E.2d 472 (1988); 725 ILCS 5/115—4(i) (West 1992))

and should instruct the jury in writing on the elements of armed robbery.

Judgment reversed and remanded for a new trial.

ZWICK, P.J., and RAKOWSKI, J., concur.