FIRST DIVISION

June 20, 2005

No.1-02-0147

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

OCTAVIS SIMS,

Defendant-Appellant.

)

)

)

)

)

)

)

)

)

Appeal from

the Circuit Court

of Cook County

No. 99 CR 1847 

Honorable

Henry R. Simmons, Jr.,

Judge Presiding.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:

Following a jury trial, defendant Octavis Sims was convicted of first degree murder under section 9-1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(1) (West 2000)) and sentenced to 23 years in prison.  He appeals, claiming that the trial court: (1) improperly admitted evidence in a pretrial hearing that he failed a polygraph examination; (2) allowed improper closing arguments by the prosecutor; and (3) misread the jury instructions on eyewitness identification.  Defendant also claims, and the State concedes, that the mittimus incorrectly reflects 863 rather than 864 days' credit for time served.  We affirm and direct the clerk of the circuit court to correct the mittimus.

Defendant was convicted of the murder of Jacqueline Bernaugh on November 30, 1998.  Codefendants Lawrence Coleman, Eddie Coleman, Kentrell Culbreath, Walter Edwards, Sam Taylor and Willie Richard were tried separately.

Defendant filed a pretrial motion to suppress the inculpatory statement he gave to an assistant State's Attorney on December 30, 1998, claiming the statement was coerced by the police.  At a hearing on the motion, Detective Daniel S. Judge testified that he advised defendant of his rights under 
Miranda
 on December 29, 1998, both when he arrested defendant and later at the Area 2 police station.  Judge also testified that defendant was not handcuffed when Judge and his partners, Detectives Lynch and Graciano, spoke with defendant in an interview room at the station.  Judge said defendant agreed to take a polygraph examination and Judge arranged it.  The following took place during the direct examination of Judge by Assistant State's Attorney Jack Wilk:

"Q.  When the polygraph examination was completed, did you have a conversation with [the polygraph examiner]?

MR. CARR (Assistant Public Defender):  ***  I am going to object if there is going to be any mention of the results or of the contents of the polygraph.

THE COURT:  Are you mentioning the results?

MR. WILK:  I was planning on [it] ***.  Just goes to the reasons for the defendant's statement.

THE COURT:  Case law doesn't prohibit the results from coming in during a pretrial hearing.  Unless you have any case law otherwise, I am going to allow it in.

BY MR. WILK:

Q.  What was the nature of your conversation with the polygraph examiner ***?

A.  [The examiner] informed us that the results of the exam showed signs of deception."

Judge said he and defendant returned to Area 2 after the polygraph examination and Judge again read defendant the 
Miranda
 warnings.  Defendant then agreed to give a statement.  Judge said that Assistant State's Attorneys Jake Rubinstein and Ashley Romito arrived at Area 2 at about 2 a.m. and advised defendant of his rights under 
Miranda
.  Defendant agreed to give a court-reported statement.  At about 5:40 a.m., defendant gave his court-reported statement in the presence of Judge and the assistant State's Attorneys.  Defendant was allowed to review the completed statement.  He then signed it.  Judge testified that defendant did not request an attorney or invoke his right to remain silent.  Judge denied that he or his partners physically or mentally coerced defendant, confronted defendant with illegally obtained evidence or made material misrepresentations to induce defendant to make a statement.

On cross-examination, Judge testified that when he took defendant into custody, he told defendant that the charge against him was the murder of the victim.  Judge admitted that defendant was in custody for about 18 hours from the time of his arrest until he finished giving his statement.  

Defendant testified that he was not advised of his rights under 
Miranda
 until he agreed to give a statement.  He claimed that initially he was not told the nature of the charges against him.  Defendant said he was not allowed to make a telephone call, contact an attorney or use the bathroom when he asked to do so.  He said he was not given anything to eat or drink until after the polygraph test.  He said he did not take the polygraph test voluntarily but agreed only after being told he could leave the police station if he passed the test.  Defendant testified that he was handcuffed for most of the time in police custody except during the polygraph exam.  He said the police chose the court-reporter method for taking his statement.  Defendant said when he gave the statement, he was tired and hungry and felt as though he had been held for two days.  He said he was first advised of his rights under 
Miranda
 while giving his statement.  

On cross-examination, defendant admitted that he said nothing in his statement about being denied his rights and, in fact, he said he had been treated well by the police and the assistant State's Attorneys.  On redirect examination, defendant said he agreed to make the statement because he was "[t]ired, ready for it to be over with" and "[b]ecause [the police] kept badgering [him] with the same thing over and over again" and telling him that his "rappies" had already talked to the police.  See 
People v. Caffey
, 205 Ill. 2d 52, 123, 792 N.E.2d 1163 (2001) (a "rappie" is a codefendant who shares the "rap" with the defendant).

The trial court denied defendant's motion to suppress, finding that the admissibility of the statement depended on the witnesses' credibility and that Judge was more credible than defendant.

At defendant's jury trial, Alice Larrue testified that she was at the victim's apartment on the night of the incident.  When the victim mentioned hearing noises outside, Larrue looked out the window.  She saw men whom she knew as "Frog" and "Tae" in the gangway next to the house.  She testified that she had known "Tae" for about seven years and his real name was Octavis Sims.  She then identified defendant in court as one of the men she saw from the victim's apartment window.  Larrue testified that the gangway was lit and she had no trouble seeing the men, who were wearing black hooded sweatshirts.  Larrue testified that, as she walked away from the window, the victim walked toward the window.  Larrue then heard 10 to 20 gunshots.  

On cross-examination, Larrue admitted that she only "peeked" out the window for a few seconds and that defendant and "Frog" had the hoods of their sweatshirts pulled up over their heads.  She also admitted that she did not tell the police until March 2000 that she had seen defendant that night.  She testified that the events leading up to her decision to testify began when she received a  telephone call from an investigator for the State's Attorney's office.  Larrue and the investigator discussed a warrant for her arrest for a probation violation.  Larrue then agreed to give a statement about what she saw on the night of the murder.  She gave a handwritten statement and then a prosecutor accompanied her to a probation hearing where she received a recognizance bond and was allowed to go home.

On redirect, Larrue said she initially did not tell the police about seeing "Frog" and defendant in the gangway because she was afraid she would be harmed if she did so.  She said she told the truth only after she was offered protection, including relocation.  Larrue said her probation was reinstated after she gave her statement.  On re-cross-examination, Larrue admitted that she already had relocated to another state before she was offered protection.

Shelley Bernaugh, daughter of the victim, testified that she was in the apartment at the time of the shooting.  She said after Larrue looked out the apartment window into the gangway, Larrue said "Frog" and "Tae" were outside with a gun.

Gregory Archer testified that he saw two men wearing black, hooded sweatshirts, one of whom was carrying a gun, at 8214 South Exchange Avenue just before the shooting.  Seconds later, he saw gunfire coming from the area of the men's hands.  Archer said he did not see the men's faces.

Officer Patrick Moran, an evidence technician, testified that he found 14 discharged cartridge cases, including a 9-millimeter bullet, in the gangway.  He said the gangway was illuminated by a streetlight, lights mounted on the side of buildings and light shining through windows.  Dr. Adrienne Segovia, an assistant medical examiner, testified that the victim died of a shotgun wound to the face and the manner of death was homicide. 

Judge testified to essentially the same facts as in the pretrial motion hearing, but he did not mention that defendant took or failed a polygraph examination.

Assistant State's Attorney Rubinstein read defendant's statement to the jury.  In it, defendant admitted he was in the Renegade Vice Lords (Renegades) street gang.  At the time of the shooting, his gang was in a dispute with a rival gang, the Mafia Insane Vice Lords (Mafia), over the murder of a Renegade member with the nickname "Chubb."  The Renegades believed that the Mafia had killed "Chubb."  In retaliation, defendant and other Renegades fired shots at the victim's apartment, where they believed three Mafia members were staying.  Defendant said he fired four or five rounds from a 9-millimeter pistol and then fled.  Defendant's statement said he was treated well by the police, given food and allowed to sleep and no threats or promises were made to induce his statement. 

Defense witness Nathaniel Hunter testified that he was with defendant between 11 and 11:45 p.m. on the night of the shooting.  Bobbie Sims, defendant's mother, testified that she was with defendant from about 12:15 to 12:55 a.m. when she drove defendant from her house at 7700 South Shore Drive to his house at 1340 West 64th Street.  Sims said after she dropped off defendant, she saw him enter his house.  Sergeant Lawrence Lynch testified that he interviewed Shelley Bernaugh, who said Larrue reported seeing "Frog," but not defendant, in the gangway before the shooting.

In his closing argument, defense counsel presented a theory that the police detectives directed defendant to deliver rehearsed "lines" to the court reporter who took his statement.  Defense counsel further impugned the testimony of the State's witnesses, saying, "[Shelly Bernaugh] had an axe to grind.  She wants someone to pay.  [The police] propped [defendant] up here as the scapegoat *** and she wanted to get [defendant] so she starts tooling around with the statements."  Defense counsel also said "Alice Larrue is not to be believed, " her "testimony isn't worth a darn," she is "a young lady who lies," and her "statement is not worth the air that it floated into your ears in."  Counsel argued that Moran, the evidence technician, "had a vested stake in the outcome and he wanted to twist it just a little bit."   

In the State's closing argument, the prosecutor said:

"[I]f you believe the Defense, [defendant] is the unluckiest man in the world.

He has got Shelly Bernaugh coming in here to lie *** against him, Alice Larrue coming in here to lie against him, the evidence technician, Officer Moran coming in here to lie against him, Gregory Archer coming in here to lie against him, Detective Judge coming in here to lie against him, Jake Rubinstein coming in here to lie against him ***." 

The prosecutor contradicted defense counsel's remarks that Bernaugh had "an axe to grind" and Larrue's testimony was not worth the air on which it floated.  

Before the jury began deliberating, the judge gave the agreed instruction for evaluating the identification testimony of a witness:

"When you weigh the identification testimony of the witness, you may consider all of the facts and circumstances in evidence, including but not limited to the following: The opportunity the witness had to view the offender at the time of the offense, or the witness's degree of attention at the time of the offense, or the witness's earlier description of the offender, or the level of certainty shown by the witness when confronting the defendant, or the length of time between the offense and the identification confrontation."  

See Illinois Pattern Jury Instructions, Criminal, No. 3.15 (3d ed. 1992) (hereinafter IPI Criminal 3d No. 3.15).

The jury returned a verdict of guilty.  Defendant filed a motion for a new trial, claiming
 that the trial court erred in denying his pretrial motion to suppress.  The trial court denied defendant's motion for a new trial and sentenced him to 23 years in prison.  

Defendant appeals, claiming: (1) the results of his polygraph examination were inadmissible at the pretrial hearing on his motion to suppress because polygraph results are unreliable and prejudicial; (2) the prosecutor misstated the law and the burden of proof in his closing arguments; (3) the trial court erred in reading IPI Criminal 3d No. 3.15 with the disjunctive "or" between the five factors in evaluating identification evidence; and (4) defendant's credit for time served should have been 864, not 863, days. 

Defendant first argues that the trial court erred in admitting evidence of his polygraph exam results at the pretrial hearing.  He claims that Judge's testimony about the polygraph results was improper because such evidence is inadmissible as inherently unreliable and prejudicial, citing 
People v. Baynes
, 88 Ill. 2d 225, 244, 430 N.E.2d 1070 (1981) (there is a significant risk that the jury will regard quasi-scientific but unreliable polygraph evidence as conclusive).  Defendant asks for a new hearing on his motion to suppress.  The State argues that this issue is waived because, although defendant objected to the polygraph evidence at the hearing, he failed to raise the issue in his posttrial motion, citing 
People v. Enoch
, 122 Ill. 2d 176, 187, 522 N.E.2d 1124 (1988) (failure to specify grounds for a new trial in a written posttrial motion constitutes waiver in the absence of plain error).  

The record shows that defendant's posttrial motion contained a general objection to the denial of his motion to suppress but did not specify improperly admitted polygraph evidence as grounds for a new trial.  Even so, we decline to regard this argument as waived.  Waiver is a rule of administration, not of jurisdiction or power.  
People v. Burson
, 11 Ill. 2d 360, 370-71, 143 N.E.2d 239 (1957); 
People v. De La Paz
, 204 Ill. 2d 426, 432-33, 791 N.E.2d 489 (2003).  We may take notice of possible errors even if no exception was preserved for review (
Burson
, 11 Ill. 2d at 370-71) and we elect to do so here.

A circuit court's ruling on a motion to suppress presents a mixed question of fact and of law.  
People v. Thomas
, 198 Ill. 2d 103, 108, 759 N.E.2d 899 (2001).  On questions of fact and  witness credibility, we exercise deference, reversing only if the court's conclusions are against the manifest weight of the evidence.  
People v. Gherna
, 203 Ill. 2d 165, 175, 784 N.E.2d 799 (2003).  A ruling is against the manifest weight of the evidence when the opposite conclusion would be evident to a reasonable, unbiased person.  
People v. Miles
, 343 Ill. App. 3d 1026, 1030, 798 N.E.2d 1279, 1283 (2003).  We review 
de novo
 the legal questions arising from the facts.  
Gherna
, 203 Ill. 2d at 175. 

Here, the trial court at the pretrial hearing heard contradictory accounts of the circumstances surrounding defendant's inculpatory statement.  The court chose to believe Judge's testimony that defendant was advised of his rights and treated well by the police, voluntarily took a polygraph examination and voluntarily gave a court-reported statement.  The court disbelieved defendant's testimony that his statement was the product of police abuse and coercion.  Because the trial court was in a position to observe the witnesses' demeanor, resolve conflicting testimony and weigh credibility, we defer to those conclusions.  
Gherna
, 203 Ill. 2d at 175.   Where, as here, the testimony on a motion to suppress is merely contradictory, the reviewing court will not substitute its assessment of the credibility of the witnesses for that of the trial judge.  
People v. Graham
, 214 Ill. App. 3d 798, 805, 573 N.E.2d 1346 (1991). 

As to the legal question of whether the polygraph evidence was improperly admitted and  prejudicial to defendant, we begin our analysis with the general rule that polygraph examination results, "in any manner and at any stage of the defendant's trial, are inadmissible as proof of guilt or innocence."  
People v. Eaton
, 307 Ill. App. 3d 397, 400-01, 718 N.E.2d 1020 (1999).  Our supreme court has barred such evidence because its quasi-scientific nature could lead a jury to give the evidence undue weight despite the widely held belief that polygraphy is unreliable.  
People v. Jefferson
, 184 Ill. 2d 486, 493, 705 N.E.2d 56 (1998).  But the ban on polygraph evidence is not absolute.  
People v. Montgomery
, 302 Ill. App. 3d 1, 11, 704 N.E.2d 816 (1998).   "Polygraph evidence may be considered as a factor in determining whether the defendant gave a statement voluntarily."  
Montgomery
, 302 Ill. App. 3d at 11.  Where polygraph evidence is admitted at a pretrial hearing on a defendant's motion to suppress, but not at the trial itself, the question of a defendant's guilt or innocence is not at issue.  
Montgomery
, 302 Ill. App. 3d at 11.  Polygraph evidence may be admitted at a suppression hearing to ascertain the voluntariness of the statement.  
Montgomery
, 302 Ill. App. 3d at 11.  See also 
People v. McClellan
, 232 Ill. App. 3d 990, 1002, 600 N.E.2d 407 (1992) (the introduction of polygraph results as evidence at a suppression hearing was not grounds for reversal). 

Here, Judge's testimony that defendant took and failed a polygraph examination was introduced only after defendant claimed in his pretrial motion that his inculpatory statement was coerced.  The administration and results of the exam offered a reasonable alternative to defendant's explanation that he gave the statement because he was mistreated during his detention. 

Defendant urges us to revisit the holdings in 
Montgomery
 and 
McClellan
.  In his brief, defendant argues "[t]he rule against the admission of polygraph 
results
 during trial is also applicable in the context of [pretrial] hearings because the same concerns of unreliability and misuse by the trier of fact are present."  (Emphasis added.)  He cites no authority for this statement, and concedes that 
Montgomery
 and 
McClellan
 are contrary, but suggests that we should not follow them because they deviate from the spirit of 
People v. Triplett
, 37 Ill. 2d 234, 226 N.E.2d 30 (1967).  For the reasons that follow, we find 
Triplett
 distinguishable.  

Defendant also cites 
People v. Yarbrough
, 93 Ill. 2d 421, 430, 444 N.E.2d 493 (1982), where the defendant was granted a new trial because polygraph results were improperly admitted in a posttrial proceeding.  In 
Yarbrough
, the trial court ordered the defendant to undergo a polygraph examination after the jury returned a guilty verdict, but before the trial court ruled on the defendant's posttrial challenge to the sufficiency of the evidence.  
Yarbrough
, 93 Ill. 2d at 423.  The judge ultimately denied the defendant's motion for a new trial, but only after the prosecutor revealed that the posttrial polygraph results showed signs of deceit.  
Yarbrough
, 93 Ill. 2d at 426-28.  The supreme court found that the trial court erred, concluding: "[t]he problem in this case is that we have no way of knowing the extent to which the trial judge's judgment was affected by his knowledge of the polygraph results or what his decision would have been had he not suggested a polygraph test.  The judge must have had some misgivings about the sufficiency of the evidence. Otherwise, he would not have brought up the subject of the polygraph."  
Yarbrough
, 93 Ill. 2d at 426.

Here, the court did not admit the polygraph evidence to assess the strength of the evidence at trial or the jury's conclusion.  The only issue addressed by the polygraph evidence at the suppression hearing was whether the exam result, not police coercion, could have prompted defendant to make a voluntary statement.  The results did not influence the judge or jury's decision as to whether defendant was innocent or guilty, whether the evidence was sufficient or whether defendant was entitled to a new trial.  The conclusions in 
Yarbrough
 are not applicable here.   

Defendant also cites as authority cases in which defendants were granted new trials after juries heard improper polygraph evidence:  
Triplett
, 37 Ill. 2d at 240 (defendant was entitled to a new trial where polygraph evidence was admitted not only at a hearing on a motion to suppress, but also before the jury when the defendant admitted on cross-examination that a polygraph test showed he was lying);  
Baynes
, 88 Ill. 2d at 230 (defendant was entitled to a new trial where the jury may have been prejudiced by the stipulated testimony of a polygraph examiner who stated the defendant lied on a polygraph test); 
People v. Gard
, 158 Ill. 2d 191, 203, 632 N.E.2d 1026 (1994) (defendant was entitled to a new trial where references to polygraph testing were ubiquitous throughout the trial).  These cases are distinguishable.  In all three, juries returned verdicts of guilty after hearing polygraph evidence.  Here, the jury heard no reference to a polygraph examination or to results showing deceit.  The jury's guilty verdict could not have been influenced by banned polygraph evidence because the jury never heard it. 

Defendant next argues that the prosecutor misstated the law and distorted the State's burden of proof in closing arguments when he said, "if you believe the [d]efense, [the defendant] is the unluckiest man in the world" because the State's witnesses came to court to "lie against him."  Defendant relies on 
People v. Miller
, 302 Ill. App. 3d 487, 706 N.E.2d 947 (1998), where the defendant was granted a new trial because the prosecutor repeatedly argued that to believe the defendant, the jury had to believe that the State's witnesses " 'all got together and they are making things up, they are adding things, they are lying, trying to put a case on [the defendant].' " (Emphasis omitted.)  
Miller
, 302 Ill. App. 3d  at 496.  There, the defendant's conviction was reversed when the appellate court found that the prosecutor's comments misstated the law, distorted the burden of proof and did not allow for the possibility that the witnesses were not lying but mistaken.  
Miller
, 302 Ill. App. 3d at 497-98.

The State argues that the prosecutor's remarks were a justified response to defense  

 counsel's assertions that Judge, Larrue and Bernaugh lied, citing 
People v. Reed
, 243 Ill. App. 3d 598, 607, 611 N.E.2d 1343 (1993) (where defense counsel devoted his closing argument to showing that the State's witnesses lied, the prosecutor was invited to respond in kind). 

In general, a prosecutor has a great deal of latitude in his or her closing argument.  
People v. Blue
, 189 Ill. 2d 99, 127, 724 N.E.2d 920 (2000).  "In reviewing a challenge to remarks made by the State during closing argument, the comments must be considered in the context of the entire closing statements of the parties."  
People v. Williams
, 192 Ill. 2d 548, 573, 736 N.E.2d 1001 (2000).  Even if a prosecutor's comment is improper, the verdict will stand unless the remark caused substantial prejudice to the defendant.  
Williams
, 192 Ill. 2d at 573.  Substantial prejudice occurs when the result would have been different in the absence of the complained-of remark.  
Williams
, 192 Ill. 2d at 573.  "Where the complained-of comments are part of a prosecutor's rebuttal argument, the statements will not be deemed improper if they were invited by defense counsel's closing argument."  
People v. Watson
, 342 Ill. App. 3d 1089, 1093, 796 N.E.2d 1087 (2003).

 Here, defense counsel made several remarks in his closing argument, challenging the credibility of witnesses Bernaugh, Larrue and Moran.  The prosecutor in rebuttal countered defense counsel's theories of how and why the State's witnesses were lying.  In viewing the prosecutor's remarks in the context of both arguments, we do not believe that his comments were improper.  Nor can it be said that the prosecutor's remarks so prejudiced defendant in the eyes of the jury that he would have been acquitted if the remarks had not been made.  The prosecutorial comments at issue here do not warrant reversal.  

Defendant next claims the trial judge misread the jury instructions on eyewitness identification by reading the bracketed word "or" in IPI Criminal 3d No. 3.15.  The supreme court has determined that "giving IPI Criminal No. 3.15 with the 'ors' is indeed plain error."  
People v. Herron
, No. 95135, slip op. at 19 (May 19, 2005).  In addition, the comments to IPI Criminal 4th No. 3.15 in the 2003 supplement to IPI now direct that the "or" (or the "and") between the factors is not to be read to the jury or included in the typed version given to the jury.  IPI Criminal 4th No. 3.15, Committee Note, at 2 (Supp. 2003).

But the seriousness of the risk of an improper conviction due to the erroneous reading of "or" in the instruction "depends upon the quantum of evidence presented by the State against the defendant."  
Herron
, slip op at 21.  In 
People v. Gonzalez
, 326 Ill. App. 3d 629, 761 N.E.2d 198 (2001), reversal was warranted because the evidence was closely balanced and the instruction was unduly stressed by the prosecutor in closing argument.  
Gonzalez
, 326 Ill. App. 3d at 64.  Accord 
Herron
, slip op. at 19.  Here, the evidence was not closely balanced nor was the erroneous instruction emphasized to the jury.  The error was harmless.  

Finally, defendant and the State agree that the mittimus incorrectly shows that defendant accrued 863 days' credit for time served when he, in fact, is entitled to 864 days' credit.  Remand is unnecessary because this court has the authority to order the clerk of the circuit court to make the appropriate corrections.  
People v. McCray
, 273 Ill. App. 3d 396, 403, 653 N.E.2d 25 (1995).  We affirm the judgment of the circuit court and direct the clerk to amend the mittimus to reflect 864 days' credit for time served.

Affirmed; mittimus corrected.

BURKE and GARCIA, JJ., concur.