NO. 4-05-0610      Filed 11/3/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,      )      Appeal from
       Plaintiff-Appellee,      )      Circuit Court of
       v.      )      McLean County
ALAN BEAMAN,      )      No. 94CF476
       Defendant-Appellant.      )
             )      Honorable
             )      Jeffrey B. Ford,
             )      Judge Presiding.
_____

JUSTICE McCULLOUGH delivered the opinion of the court:

After a jury trial, defendant, Alan Beaman, was convicted of the first-degree murder of his ex-girlfriend, Jennifer Lockmiller. Defendant was sentenced to 50 years' imprisonment in the Illinois Department of Corrections. On appeal, this court affirmed defendant's conviction. People v. Beaman, No. 4-95-0396 (May 23, 1996) (unpublished order under Supreme Court Rule 23). On April 2, 1997, defendant filed a petition for postconviction relief. In its final form, defendant's second verified amended petition for postconviction relief and supplement to the second amended petition were presented before the trial court through an evidentiary hearing. On June 14, 2005, the trial court issued a 31-page order denying defendant's request for postconviction relief. Defendant appeals the third-stage dismissal of his petition. We affirm.

It is undisputed by the parties, the trial court, and this court that the case against defendant was entirely circumstantial, and as such, depended upon a large body of facts. These facts are well known by all parties and have been extensively recounted by

this court in its Rule 23 order affirming defendant's conviction. Therefore, only those facts necessary for a complete understanding of the issues before this court appear below.

After his conviction was affirmed by this court, defendant filed for postconviction relief, arguing (1) new evidence demonstrates that defendant could not have been in Bloomington/Normal on the day of the murder; (2) postconviction evidence establishes there was a viable murder suspect other than defendant of whom the jury was unaware, and the State committed a Brady violation (see Brady v. Maryland, 373 U.S. 83, 10 L.Ed. 2d 215, 83 S. Ct. 1194 (1963)) when it failed to disclose evidence supporting John Doe's viability as a suspect; (3) the State exploited Detective Freesmeyer's false and misleading testimony that 31 minutes were required to drive from the bank to the Beaman residence; (4) the State failed to disclose the fact that Freesmeyer drove from the bank to the Beaman home in 25 minutes; (5) defendant's attorney was ineffective for failing to independently investigate the drive time from the bank to the Beaman home, for failing to elicit evidence regarding Freesmeyer's 25-minute time trial, and for failing to discover and present the information regarding John Doe; and (6) he is actually innocent of Lockmiller's murder.

On August 28, 1993, Lockmiller's body was discovered in her apartment near Illinois State University. Based on autopsy results and Lockmiller's last known whereabouts, the State theorized she was murdered on Wednesday, August 25, 1993, at or shortly after noon. The police investigation quickly centered around defendant, and the State built its case against him relying upon his motive and opportunity to murder his ex-girlfriend.

According to the State's motive theory, defendant was obsessed with Lockmiller. Lockmiller pursued a relationship with defendant's roommate, and then she

˅ 2 ˅

and defendant had a bitter break up.  However, a phone call from Lockmiller to defendant rekindled his hopes the two would reconcile.  Defendant drove to Normal, Illinois, to surprise Lockmiller.  However, upon entering her apartment, defendant saw his roommate's belongings, and he snapped, killing Lockmiller on the spot.

The State's opportunity theory is defendant left work on Wednesday morning, drove to his Rockford home to take a shower, and then went to the bank to make a deposit.  A security videotape shows defendant leaving the bank at 10:11 a.m.  Defendant then drove 124 miles to Normal, averaging 75 miles per hour, to surprise Lockmiller when she returned home from class to watch her favorite noon-hour soap opera.  He had not yet formed his intent to kill his ex-girlfriend.  Once he and Lockmiller entered her apartment, something went wrong, and defendant snapped.  He strangled Lockmiller with the cord from a clock-radio and then stabbed her multiple times with a pair of scissors.  Defendant then arranged Lockmiller's clothes in such a way as to suggest she had been raped.  After no more than 15 minutes, by 12:15 p.m., defendant left Lockmiller's apartment and drove back to his home in Rockford, averaging 75 miles per hour, to ensure he was home in bed by 2:10 p.m., five minutes before his mother got home.

Evidence was presented at trial that two phone calls were made from the Beaman residence on the morning of Wednesday, August 25, 1993, one at 10:37 a.m. and one at 10:39 a.m.  The first call was made to the Beamans' church and was two minutes in duration.  The second call was made to defendant's youth pastor's home and lasted one minute.

Evidence was presented at trial and the postconviction evidentiary hearing that defendant's mother, Carol Beaman, picked up her elderly mother from Independence Village, an assisted-living facility, early on August 25, 1993, for a doctor's appointment.

After the appointment, the two stopped for breakfast before returning to Independence Village. Check-in records show Carol checked her mother back into the facility at 10 a.m. At trial, Carol testified she would have remained with her mother no more than 15 to 20 minutes after her check-in time. Sometime after trial, Carol realized her mother's appointment fell on a Wednesday, and it was Carol's routine to prepare her mother's medication for the upcoming week on Wednesdays. As such, at the post-conviction evidentiary hearing, Carol testified she spent 20 to 30 minutes with her mother that morning after checking her in, possibly longer if her mother's roommate had been present.

At trial, evidence was presented that Carol paid for a purchase at a Wal-Mart store located across the street from Independence Village at 11:10 a.m. The receipt indicated she had purchased copy paper, poster frames, magazine holders, and blue jeans. She testified she went to Wal-Mart immediately after leaving her mother and did not go home to make two telephone calls. After leaving Wal-Mart, Carol testified she then may have gone to K mart before proceeding to Union Hall, where she made a purchase and received a receipt time-stamped at 12:39 p.m. Carol then proceeded to Gray's IGA store, where she purchased perishable food items and received a receipt time-stamped at 2:03 p.m. She then testified she went straight home and arrived around 2:15 p.m. She testified when she arrived home, defendant's car was on the paved apron next to the driveway. When she entered the home, she noticed the piece of Plexiglas the family used to keep their dogs confined to the kitchen had been moved, and defendant's dog was asleep by his bedroom door, as was the dog's custom when defendant was in his bedroom. Carol saw her son that evening when he awoke for dinner.

The State's theory is Carol dropped her mother off at Independence Village and then drove home to either use the restroom or let the dogs out before returning to

complete her shopping trip at Wal-Mart. At the postconviction evidentiary hearing, Detective Timothy Freesmeyer testified this drive would have taken Carol approximately 15 minutes. While at home, she returned a phone call made from the church to her home at 10:22 a.m. She first tried the church office and then attempted to call the youth pastor at his home. Carol then left her home and traveled back to the Wal-Mart located across the street from Independence Village.

The defense argued Carol did not and could not have made the two telephone calls on August 25, 1993. First, she testified she did not go home after dropping her mother off, and she did not make the two telephone calls. Second, an investigator for the defense, hired for post-conviction proceedings, testified his timed trials of the route Carol would have taken from Independence Village to her home illustrated it would have taken her between 19 and 20 minutes to arrive home. This would not have allowed her enough time to leave her mother between 10:20 a.m. and 10:30 a.m. and travel home to make the two telephone calls at 10:37 a.m. and 10:39 a.m. Further, the defense argues the postconviction evidence shows Carol would not have had enough time to return to Wal-Mart, shop for her purchases, and then check out by 11:10 a.m. In addition, the defense presented postconviction testimony from Pastor Mitchell Olson, defendant's then youth pastor. He testified defendant was scheduled to perform at the August 29, 1993, Sunday morning church service, and as was his usual practice, he would have telephoned defendant on Wednesday, August 25, 1993, to confirm rehearsal with him that evening. Although Olson did not specifically remember making the call, telephone records show a telephone call was placed from the church to the Beaman residence at 10:22 a.m. Olson testified he would have left a message, and defendant would have returned the call to the church or would have tried to reach Olson at his home. Olson further testified he did not

remember Carol ever calling him at church or his home prior to the date in question. Olson did remember calling the Beaman residence again at 3 p.m. that day, and he spoke with Carol and confirmed defendant's rehearsal that evening, which took place as planned.

In light of the above evidence, defendant argues only he could have made the two telephone calls, a contention with which the State takes sharp issue. At trial, the State presented drive-time evidence demonstrating defendant could not have driven from the bank at 10:11 a.m. to his home in time to make the two phone calls at 10:37 a.m and 10:39 a.m. Freesmeyer testified he drove from the bank to defendant's home using the most direct route through downtown Rockford. Obeying all speed limits, Freesmeyer testified the drive took him 31 minutes, which would not have allowed defendant enough time to leave the bank at 10:11 a.m. and arrive home in time to make the first telephone call at 10:37 a.m.

In opposition, defendant argues he could have and did make it home in time to make the two telephone calls. Defendant testified at trial that he drove from the bank to his home using what is commonly known as the "bypass" route, a route which travels on the outskirts of the city of Rockford, instead of traveling through downtown Rockford. Although longer in distance, this route is commonly known to be faster as far as travel times. During the postconviction evidentiary hearing, Freesmeyer admitted that prior to trial, he had conducted a timed drive from the bank to defendant's home using the "bypass" route. Before the grand jury, Freesmeyer testified he obeyed all speed limits and arrived at defendant's house in 25 minutes. Although this testimony was given to the defense through discovery, no mention was made of the timed trial of the "bypass" route at trial. In addition, at the postconviction evidentiary hearing, Freesmeyer admitted this timed trial was not mentioned in his final case report, and he did not know what had happened to his

˘ 6 ˘

notes taken while conducting the timed trial.

In further support of his contention that he did travel from the bank to his home in time to make the two telephone calls, defendant presented the testimony of an inspector he hired for the postconviction proceedings. The investigator testified in 1999, he conducted three timed trials of the route between the bank and the Beaman's home via the "bypass" route. On each trip, he drove above the speed limit, but with the flow of traffic, and averaged 22 minutes per trip. In addition, the investigator conducted two timed trials of the route between the bank and the Beaman's home via downtown Rockford. Again, he drove above the speed limit, but with the flow of traffic, and the trips took him 26 and 27 minutes, respectively. Although defendant testified at trial he drove home via the "bypass" route, he argues the above evidence illustrates he could have made it home traveling either route and arrived in time to make the telephone calls.

At the postconviction evidentiary hearing, evidence was presented regarding a potential viable suspect in the Lockmiller murder. Prior to defendant's trial, the State filed a motion in limine, asking the court to preclude from trial any evidence of Lockmiller's drug use, sexual relationships, and history other than as they related to her relationship with defendant's roommate, Michael Swaine. Defense counsel asked the court to specifically consider Lockmiller's relationship with John Doe, including the sexual history of the two and their involvement with drugs. The State assured the court that Doe had nothing to do with the murder case. The court sustained the State's motion, and the defense was precluded from presenting any evidence at trial regarding any specific third-party suspects. At the postconviction evidentiary hearing, Lieutenant Tony Daniels of the Normal police department testified he believed Doe was and continues to be a viable suspect in the

˅ 7 ˅

Lockmiller murder. Doe was Lockmiller's former boyfriend, and according to Doe, the two had been about to rekindle their romance. Doe also supplied Lockmiller with drugs, and she owed him money. He lived a short distance from Lockmiller's apartment, and visited her a few days before her murder only to find her in the company of her latest boyfriend, Swaine. Daniels interviewed Doe on two occasions in the fall of 1993 and found him to be evasive on each occasion. During the first interview, Doe claimed he went out of town on August 24, 1993, the day before the murder. During his second interview, Doe told Daniels he did not leave town until 4 p.m. on August 25, 1993. Doe's girlfriend told police she was with him from 1 p.m. to 4 p.m. on August 25, 1993. Daniels also testified Doe was asked to take a polygraph examination. Doe was examined as a suspect, but the examination could not be completed because Doe was not cooperative. The polygraph examiner testified a lack of cooperativeness could have been intentional in order to avoid completing the examination. Doe was asked to complete a second polygraph examination, to which he originally agreed; but due to his lack of cooperation, it did not occur. Daniels also testified that prior to trial, he learned Doe had been charged with domestic battery against his girlfriend, as well as possession of marijuana with intent to deliver. Doe's girlfriend alleged he had pinned her to the floor and beat her repeatedly in the chest, leaving visible injuries. She also told police Doe was using steroids, which caused him to act erratically. Doe's arrests for a drug offense and domestic battery, his steroid use, and his lack of cooperation during a polygraph examination were not disclosed to the defense prior to trial.

On June 14, 2005, after considering evidence presented at the postconviction evidentiary hearings, the written arguments of counsel in response thereto, the Rule 23 order issued by this court, and certain testimony from trial and counsels' closing arguments at trial, the trial court denied defendant's request for postconviction relief.

On appeal, defendant argues (1) he was denied due process when the State failed to correct misleading testimony by Freesmeyer that it was impossible for defendant to have made the two telephone calls from his home on the day of the murder, (2) he was denied the effective assistance of counsel in that his attorney did not investigate and present available evidence that would have proved to the jury that defendant did in fact make the two telephone calls, and (3) he was denied due process when the State failed to disclose material and exculpatory information to the defense regarding a viable suspect, other than defendant, in Lockmiller's murder.

The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 through 122-8 (West 2004)) provides a means through which a defendant can challenge his conviction for violations of federal and state constitutional rights. People v. Petty, 367 Ill. App. 3d __, __, 853 N.E.2d 429, 433 (2006). To obtain postconviction relief, a defendant must show a substantial deprivation of constitutional rights in the proceedings that resulted in his conviction or sentence. Petty, 367 Ill. App. 3d at __, 853 N.E.2d at 433. Postconviction relief is limited by considerations of waiver and res judicata "to constitutional matters which have not been, and could not have been, previously adjudicated." People v. Winsett, 153 Ill. 2d 335, 346, 606 N.E.2d 1186, 1193 (1992). Issues that could have been raised on direct appeal, but were not, and any issues previously decided by a reviewing court will not be considered in a postconviction proceeding. People v. Simpson, 204 Ill. 2d 536, 546, 792 N.E.2d 265, 274 (2001).

Defendant argues he was denied due process of law when the State failed to correct Freesmeyer's allegedly misleading testimony regarding drive times from the bank to the Beamans' residence. Before the grand jury, Freesmeyer testified the bypass route was probably the quickest route to the Beaman residence. In a timed drive, Freesmeyer

testified he made it to the Beaman residence in 25 minutes, a time that illustrates defendant could have placed the first phone call at 10:37 a.m. At trial, Freesmeyer testified he drove from the bank to the Beaman residence, using the "most direct" route through downtown Rockford, in 31 minutes. According to Freesmeyer, he wanted to "see if it was possible" for defendant to have left the bank at 10:11 a.m. and have made it home in time to place the first telephone call at 10:37 a.m. The State did not elicit testimony regarding Freesmeyer's timed drive of the bypass route and such was not brought out on cross-examination. Defendant argues Freesmeyer's testimony clearly implied that defendant could not have made it home in time to make the two phone calls. Defendant maintains it was incumbent upon the State to correct Freesmeyer's testimony because the State was well aware it was possible for defendant to have arrived home in time to make the two phone calls. Defendant submits a reasonable likelihood exists that Freesmeyer's testimony could have affected the judgment of the jury, and therefore, his conviction should be reversed. The State argues defendant has forfeited this issue for review as it could have been raised on direct appeal and was not. We agree.

A postconviction petition is a collateral attack on a conviction and/or resulting sentence and is therefore not a substitute or addendum for a direct appeal. Simpson, 204 Ill. 2d at 551, 792 N.E.2d at 277. Consequently, any issue that could have been raised on direct appeal and was not is forfeited for review. Simpson, 204 Ill. 2d at 551, 792 N.E.2d at 277. However, strict application of forfeiture will be relaxed when (1) fundamental fairness so requires, (2) the alleged forfeiture stems from the incompetence of appellate counsel, and (3) the facts relating to the claim do not appear on the face of the original appellate record. People v. Newman, 365 Ill. App. 3d 285, 288, 848 N.E.2d 262, 266 (2006). To successfully argue the fundamental-fairness exception to forfeiture should apply, a

defendant must satisfy the "cause and prejudice" test by "objectively showing that defense counsel's efforts to raise the claim on direct review were impeded <u>and</u> that the error so infected the entire trial that the defendant's conviction violates due process." (Emphasis in original.) <u>Simpson</u>, 204 Ill. 2d at 552, 792 N.E.2d at 277-78.

In the case at bar, defendant has not met any of the three exceptions. First, defendant has not satisfied the "cause" element of the "cause and prejudice" test. Defendant merely states in his reply brief that "the failure [of his counsel] to raise a due-process claim on direct appeal is a further example of counsel's ineffectiveness around this issue." A one-sentence claim of ineffectiveness is not sufficient to objectively show counsel's efforts to raise the issue on direct review were impeded. Further, a one-sentence claim of ineffective assistance will not successfully invoke the second exception to the forfeiture rule. Although defendant devotes an entire portion of his argument to the ineffectiveness of his trial counsel regarding the cross-examination of Freesmeyer, he did not present argument that his appellate counsel was ineffective for failing to present the false-and-misleading-testimony issue on direct review. Finally, the evidence upon which defendant's claim is based was available on the face of the original appellate record. As such, defendant's claim he was denied due process because of Freesmeyer's false and misleading testimony, and the State's failure to correct such, is forfeited.

However, even if we were to review defendant's claim, it would fail on its merits. The State's knowing use of perjured testimony to obtain a criminal conviction is a violation of a defendant's due-process rights, and a conviction obtained through such testimony must be overturned. <u>Simpson</u>, 204 Ill. 2d at 552, 792 N.E.2d at 278. The same principles apply when the State fails to correct false testimony when it appears. <u>Simpson</u>, 204 Ill. 2d at 552, 792 N.E.2d at 278. This does not mean the State must impeach its

witnesses with any and all evidence bearing upon their credibility. Simpson, 204 Ill. 2d at 552, 792 N.E.2d at 278.

In its order denying defendant postconviction relief, the trial court found Freesmeyer's testimony to be neither false nor misleading. The court noted defense counsel had the transcripts of the grand-jury hearing, and Freesmeyer was available for cross-examination. Further, the court found the State merely advocated the length of time a police officer determined it took someone to travel the route the State believed defendant took to reach his home. The State presented evidence of why it believed defendant took the downtown route. The defense presented evidence to the jury that a quicker route existed. The court found the State did not mislead the jury in arguing for its version of events. The court's conclusion is not against the manifest weight of the evidence. See People v. Montano, 365 Ill. App. 3d 195, 198, 848 N.E.2d 616, 619 (2006) (stating a postconviction petition dismissed following an evidentiary hearing will generally be reviewed for manifest error).

Next, defendant argues his trial counsel was ineffective for failing to elicit certain information before trial and at trial that would have convinced the jury that defendant could not have been at Lockmiller's apartment at the time of her murder. Specifically, defendant argues his trial counsel was ineffective for (1) failing to elicit evidence in cross-examination regarding Freesmeyer's 25-minute timed trial; (2) failing to hire an independent investigator to conduct independent timed trials for the defense; (3) failing to adduce testimony that would have convinced the jury Carol, the only other person who could have made the two telephone calls, did not make the calls; and (4) failing to show defendant, and not his mother, was the person who had reason to contact his youth pastor. Defendant argues the cumulative effect of these alleged errors deprived him of his constitutional right

to the effective assistance of counsel.

Defendant argues the trial court's ruling on this issue is entitled to no deference and urges this court to review this issue de novo. Defendant argues the trial court applied the wrong legal standard in reviewing his ineffective-assistance-of-counsel claim. Specifically, he states the court used the "farce or sham" standard rather than the accepted standard set forth in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), as adopted by this state in People v. Albanese, 104 Ill. 2d 504, 526, 473 N.E.2d 1246, 1255 (1984). We disagree with defendant's interpretation of the trial court's reasoning.

In its order, the trial court began its discussion of defendant's ineffective-assistance-of-counsel claim by stating, "[t]his is not the makings of an ineffective[-]assistance[-]of[-]counsel claim pursuant to Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)." Although the trial court here quoted what is known as the "farce or sham" standard, it went on to cite from Strickland as follows:

> "[S]trategic choices made after thorough investigation of the
> law and facts relevant to plausible options are virtually
> unchallengeable; and strategic choices made after less than
> complete investigation are reasonable precisely to the extent
> that reasonable professional judgments support the limitations
> on investigation. In other words, counsel has a duty to make
> reasonable investigations or to make a reasonable decision
> that makes particular investigations unnecessary. In any
> ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the

circumstances, applying a heavy measure of deference to counsel's judgments."

The trial court did not apply the wrong legal standard; and therefore, its holding on defendant's ineffective-assistance-of-counsel claim will be reviewed for manifest error. See People v. Hightower, 258 Ill. App. 3d 517, 519, 629 N.E.2d 1197, 1199 (1994) (holding trial court's postconviction decision that the defendant had been denied the effective assistance of counsel was to be reviewed for manifest error). "[M]anifest error" means "error which is clearly evident, plain, and indisputable." Hightower, 258 Ill. App. 3d at 519, 629 N.E.2d at 1199.

Defendant's claims of ineffective assistance of counsel each focus on defense counsel's perceived lack of effort to establish it was defendant who had made the two telephone calls at 10:37 a.m. and 10:39 p.m., and not his mother. Under Strickland, a defendant must prove (1) defense counsel's performance fell below an objective standard of reasonableness, and (2) a reasonable probability exists that, but for his counsel's performance, the result of the proceeding would have been different. People v. Rodriguez, 364 Ill. App. 3d 304, 312, 846 N.E.2d 220, 226 (2006). Effective assistance means competent, not perfect, representation. Rodriguez, 364 Ill. App. 3d at 312, 846 N.E.2d at 226. For the purposes of an ineffective-assistance-of-counsel claim, it is insufficient to argue another attorney, with the benefit of hindsight, would have acted differently than trial counsel. Rodriguez, 364 Ill. App. 3d at 312, 846 N.E.2d at 226. Only the most egregious tactical or strategic blunders will be seen as objectively unreasonable representation. Rodriquez, 364 Ill. App. 3d at 312, 846 N.E.2d at 227.

The postconviction record illustrates defense counsel's primary strategy at trial was to prove defendant's lack of opportunity to commit Lockmiller's murder based on

verifiable mileage evidence. At trial, evidence was presented that defendant had new tires put on his car on August 24, 1999, the day before Lockmiller's murder. The dated Sears receipt indicated the odometer on defendant's car read 77,479 miles. On August 30, 1993, two days after defendant was first questioned in connection with the murder, his mother checked the mileage on his car. The car had been driven 322 miles since the new tires had been put on the car. Defendant's mother told defendant to stop driving the car. On September 1, 1993, defendant's mother took a photograph of the odometer, which registered another 10 miles since it had been checked on August 30, 1993. During the postconviction evidentiary hearing, defense counsel stated the most important feature of his defense was to illustrate, based on the number of miles driven by defendant's car since the new tires had been installed and defendant's known travels between August 24 and September 1, that it was impossible for defendant to have traveled to Bloomington/Normal to kill Lockmiller. To this end, defense counsel hired an investigator to measure mileage between various locations. Because drive times were "not really" the focus of his defense, defense counsel stated he conducted "minimal cross-examination" of Freesmeyer with respect to drive times between the bank and the Beaman residence. In addition, he admitted he neither presented any evidence to rebut Freesmeyer's testimony nor did he cross-examine Freesmeyer regarding his grand jury testimony. Defense counsel testified he did not conduct any time trials.

Defense counsel's decision to focus on mileage rather than drive times was a strategic choice, and that decision is entitled to substantial deference. Defense counsel noted he had verifiable evidence of mileage. Because of a multitude of factors, including route taken, speed, time of day, et cetera, the same cannot be said of drive-time evidence. Defense counsel's decision to focus on evidence he believed to be more concrete is not

15

objectively unreasonable. Merely because defendant's postconviction counsel would have focused on drive-time evidence, it does not follow defendant's trial counsel was ineffective for failing to do so. In its order denying postconviction relief, the trial court set forth in great detail defense counsel's efforts in this case. Based on the record, the trial court's decision is not manifestly erroneous.

Finally, defendant argues the State withheld material and exculpatory evidence regarding a viable suspect in the Lockmiller murder in violation of defendant's due-process rights. Defendant alleges evidence of Doe's drug arrest, allegations made against him for domestic violence, his steroid use, and his failure to cooperate in a polygraph examination was improperly withheld from the defense. Defendant maintains had this information been made readily available to him, he would have used it to persuade the trial court during pretrial proceedings to admit evidence during trial regarding Doe's false alibi, his violent temper, and the full nature of his relationship with Lockmiller, including that she allegedly owed him money for drugs. Had the trial court allowed such evidence, defendant argues, the jury would not have returned a guilty verdict because the circumstantial evidence against Doe could not exclude him as the perpetrator of the murder.

In its order denying postconviction relief, the trial court held defendant had not presented enough evidence to the court to show either that the result of his trial would have been different or that the results of the motion in limine would have been different had the previously unknown evidence regarding Doe been available. The trial court's ruling will not be disturbed absent manifest error. See People v. Rish, 344 Ill. App. 3d 1105, 1110, 802 N.E.2d 826, 831 (2003) (finding denial of third-stage postconviction allegations of a Brady violation to be reviewed for manifest error).

In criminal cases, the prosecution is required to disclose evidence that is favorable to the accused and material either to the issue of guilt or punishment. People v. Thomas, 364 Ill. App. 3d 91, 101, 845 N.E.2d 842, 852 (2006). Evidence is material if there is a reasonable probability that the result of the defendant's trial would have been different had the prosecution disclosed the evidence. Thomas, 364 Ill. App. 3d at 101, 845 N.E.2d at 852-53. A reasonable probability of a differing result is one sufficient to undermine confidence in the actual outcome. Thomas, 364 Ill. App. 3d at 101, 845 N.E.2d at 853. To succeed on a claimed Brady violation, a defendant must show (1) the undisclosed evidence is favorable to him because it is either exculpatory or impeaching, (2) the evidence was either willfully or inadvertently withheld by the State, and (3) withholding the evidence resulted in prejudice to the defendant. People v. Rapp, 343 Ill. App. 3d 414, 418, 797 N.E.2d 738, 741 (2003).

The crux of defendant's claim is he was prevented from disclosing evidence of another viable suspect in Lockmiller's murder. It is well established that a defendant may offer evidence tending to show someone other than he committed the crime. People v. Whalen, 158 Ill. 2d 415, 430, 634 N.E.2d 725, 733 (1994). However, such evidence is properly excluded if it is remote or speculative. Whalen, 158 Ill. 2d at 431, 634 N.E.2d at 733. Such is the case here. Defendant argues he should have been permitted to present the following evidence to the jury: (1) according to Doe, he and Lockmiller were involved in a previous dating relationship and had plans to reestablish the relationship; (2) Doe was in Bloomington/Normal on the day of the murder with no one to account for his whereabouts until 1 p.m.; (3) Doe had a history of violence against another girlfriend; (4) the last time Doe allegedly saw Lockmiller, she was in the company of another boyfriend; (5) Doe used steroids; and (6) Doe dealt marijuana, and Lockmiller allegedly owed him money for

marijuana. The preceding is too remote and speculative to connect Doe to Lockmiller's murder, and the trial court could have properly excluded such evidence from the jury's consideration. As such, because such evidence would not have been admissible to establish someone other than defendant committed the murder, defendant cannot say there is a reasonable probability that disclosure of Doe's polygraph results, his steroid use, his drug arrest, and allegations against him of domestic violence would have affected the outcome of his trial. People v. Pecoraro, 175 Ill. 2d 294, 308, 677 N.E.2d 875, 882 (1997).

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

KNECHT, J., concurs.

COOK, J., dissents.

JUSTICE COOK, dissenting:

I respectfully dissent. I would reverse the conviction and remand for a new trial.

The trial court gave careful consideration to this petition for postconviction relief. One of my disagreements with the trial court, however, is its holding that evidence that the crime was committed by the individual referred to as "John Doe" could not be admitted. The trial court cites People v. Thomas, 145 Ill. App. 3d 1, 13, 495 N.E.2d 639, 647 (1986), for the proposition that "if the circumstances are too remote or speculative, such evidence is properly excluded." This rule has been criticized as a "rubric," which avoids articulation of the trial concerns on which it is based. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1, at 193 (7th ed. 1999). Our supreme court has recognized that it is difficult "to define the precise limits" which control admission of evidence that the crime could have been committed by another. People v. Nitti, 312 Ill. 73, 90, 143 N.E. 448, 454 (1924).

Courts in other jurisdictions have held that when the State relies upon direct evidence in a criminal case, circumstantial evidence that someone other than the defendant had a motive to commit the crime charged is irrelevant in the absence of other evidence to connect the third party to the crime. State v. Evans, 275 Kan. 95, 102-03, 62 P.3d 220, 226 (2003). By contrast, if the prosecution's case against the defendant is largely circumstantial, then the defendant may neutralize or overcome such evidence by presenting sufficient evidence of the same character tending to identify some other person as the perpetrator of the crime. State v. Clark, 78 Wash. App. 471, 479-80, 898 P.2d 854, 859 (1995) (arson conviction reversed where evidence was excluded that another person had motive, opportunity, and ability to commit offense).

The same approach is followed in Illinois. Direct evidence was presented in the case relied upon by the trial court, the Thomas case. In Thomas, the victim of a rape positively identified the defendant as the perpetrator. Thomas, 145 Ill. App. 3d at 8, 495 N.E.2d at 644. It is a mistake to apply the Thomas rule to the present case, where it is undisputed that the case against defendant was entirely circumstantial. No direct evidence was presented in this case, only evidence that defendant had "motive and opportunity." "Opportunity alone, however, is not sufficient to sustain a conviction unless the State can prove beyond a reasonable doubt that no one else had the opportunity to commit the crime." People v. Dowaliby, 221 Ill. App. 3d 788, 797, 582 N.E.2d 1243, 1249 (1991). Under Dowaliby, not only is other-perpetrator evidence admissible, the State has an affirmative burden to prove it does not exist. Dowaliby is the case most similar to ours, but the State unfortunately does not address it in its brief. In Dowaliby, the First District reversed a murder conviction because the State did not prove that the defendant was the only person who had the opportunity to murder the victim. Dowaliby, 221 Ill. App. 3d at 800-01, 582 N.E.2d at 1250-01.

Our case is not the standard other-perpetrator case. But even applying the standard rule set out in Thomas, the argument that John Doe's connection to this case is "remote or speculative" is clearly mistaken. Doe had been involved in a sexual relationship with the victim within six months of the murder, before she began her relationship with defendant. Doe lived a short distance from the victim's apartment in Normal. According to Doe, the two had been about to rekindle their romance. Doe visited the victim a few days before her murder only to find her in the company of her latest boyfriend, Swaine. Doe left town a few hours after the murder. Doe originally told police he was out of town at the time

˘ 20 ˘

of the murder, but later admitted that was not correct.

It is interesting to consider the State's argument in its brief:

"Defendant had an overwhelming motive to commit the offense. [The victim] broke up with defendant in mid-July. Thereafter, defendant was consumed with jealous rage because he suspected her relationship with Swaine, his friend and roommate. Defendant's brief says that he 'had never been violent' towards her, but he had broken her door down twice trying to find his ex-girlfriend with a new love interest [once with Swaine inside, once with Doe inside]. Defendant was still trying to let go, even after he left Normal. However, defendant still loved her when he went back home to Rockford."

Everything the State said regarding defendant applies equally to Doe. The victim broke up with Doe. Doe was trying to get back together with the victim at the time of the murder. Doe visited the victim a few days before the murder, only to find her in the company of Swaine. Doe was capable of violence and in fact had been charged with domestic violence against another girlfriend. Doe's opportunity to commit the offense was significantly greater than defendant's almost impossible "opportunity." Defendant should have been allowed to present the same type of evidence regarding Doe that the State presented against defendant.

The prosecutor assured the court and counsel, prior to trial, that Doe was not a viable suspect. That was not true. At the postconviction hearing, Lieutenant Daniels testified that Doe was a viable suspect prior to trial and remains so even today. Prior to

trial, the State did not disclose that Doe had been asked to submit to a polygraph examination but would not follow the polygrapher's direction, perhaps intentionally in order to avoid completion of the examination. The State did not disclose that Doe agreed to another examination but later backed out. The State did not disclose that Doe had been investigated for domestic violence against a girlfriend and charged with that offense. It is a violation of due process for the prosecution to fail to turn over potentially exculpatory evidence. U.S. Const., amends. V, XIV; Brady, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. Both defense counsel and the trial court were entitled to rely on the prosecutor's representations that there was no additional evidence from which it could be argued that Doe was a viable alternative suspect. Banks v. Dretke, 540 U.S. 668, 695, 157 L. Ed. 2d 1166, 1192, 124 S. Ct. 1256, 1275 (2004) (after prosecutor's representation, defendant under no duty to "scavenge for hints of undisclosed Brady material").

The prosecutor himself introduced evidence that the crime may have been committed by someone other than defendant. The prosecutor introduced evidence that there were three suspects in this case: defendant, Swaine, and Stacy Gates. The prosecutor introduced evidence that Swaine and Gates had alibis and argued that defendant was the only suspect who did not have an alibi, leaving the jury to believe no one else had the motive and opportunity. In closing argument, the prosecutor told the jury that Swaine had "a dead-bang iron-clad alibi" and that the prosecution had also looked at Gates and "a lot of people." "And guess who sits in the courtroom *** with the gap in his alibi still unclosed even after all this?" With all this evidence of other suspects, why did the prosecutor object to such evidence being presented as to Doe? Swaine and Gates were helpful to the prosecution case, but Doe was not because he did not have an alibi. If the trial court had known what the prosecution knew about Doe, it would not have accepted the

prosecution's argument that Doe "has nothing to do with this case."  If the trial court had known what the prosecution knew, it would not have granted the prosecution's motion in limine.

The State argues that Doe did have an alibi, that he was with a girlfriend at 1 p.m. on the day of the murder.  That argument is contrary to the position that the State has taken until now, that the murder was committed before 12:15 p.m. so that defendant could drive the 124 miles back to Rockford and be home when his mother got home at 2:15 p.m. The State now argues that the murder could have occurred at 2 p.m. and the mother could be lying.  The prosecutor, however, told the jury that the mother was not lying; if the jury had been required to believe she was lying in order to convict, the jury very well may not have done so.  The problem underlying this entire case is that the State is attempting to build a mountain out of grains of sand.  There are no facts that are important.  When defendant shows that his odometer reading would not permit a trip to Bloomington, the State argues that the odometer was tampered with.  When defendant presents evidence that a prior owner tampered with the odometer, the State argues that defendant could have used his uncle's car.  When it is convenient, the murder occurred at 2 p.m. and the mother was lying.  Given the weak and shifting evidence in this case, any withholding of evidence by the State warrants reversal.

The State argues that evidence of Doe's difficulties with the polygraph examination and his domestic-violence charge could not have been presented to the jury. The evidence certainly could have been considered by the court, however, in determining whether Doe was a viable suspect.  Evidence of the domestic-violence charge could certainly have been considered by the jury.  Character evidence, such as the commission of other crimes, wrongs, or acts (of the accused), may be admitted for any other purpose

than to show propensity to commit crime. The concern with such evidence is not that it is not relevant, but that it is unduly prejudicial to the defendant, that it has "too much" probative value. "Courts generally prohibit the admission of this evidence to protect against the jury convicting a defendant because he or she is a bad person deserving punishment." People v. Donoho, 204 Ill. 2d 159, 170, 788 N.E.2d 707, 714 (2003). That concern is not present when the witness is not the defendant. It is not important whether the jury dislikes a witness, only whether it believes he is telling the truth.

It is inconsistent for the State to argue that it could present character evidence against defendant, but similar character evidence could not have been presented against Doe. In closing argument, the prosecutor commented on the instruction that evidence that defendant had been involved in conduct other than that charged in the indictment could be considered only on the issue of the defendant's motive. "We have considerable amount of evidence as to Mr. Beaman's conduct on other occasions; knocking in doors and that sort of thing." "You're not here to convict Mr. Beaman because he's knocked in a door on some other occasion, or because he's been loud, or obnoxious, or rude on some other occasion. But as that evidence goes to the overall motive involved in his relationship with Jennifer, you may consider it in that light."

It is not clear that the polygraph evidence could not have been presented to the jury. If the State wanted to make that argument, it should have disclosed the evidence and given the trial court an opportunity to rule on it. The ban on polygraph evidence is not absolute. People v. Sims, 358 Ill. App. 3d 627, 634, 832 N.E.2d 237, 243 (2005). For example, polygraph evidence may be considered as a factor in determining whether the defendant gave a separate statement voluntarily. People v. Jefferson, 184 Ill. 2d 486, 495, 705 N.E.2d 56, 61 (1998). "Where polygraph evidence is admitted at a pretrial hearing on

a defendant's motion to suppress, but not at the trial itself, the question of a defendant's guilt or innocence is not at issue." Sims, 358 Ill. App. 3d at 635, 832 N.E.2d at 243. Doe's refusal to take a polygraph examination was properly considered by the police in determining whether he was a suspect and should have been considered by the court on the motion in limine for that same purpose.

Some of the cases cited by the State involved a "bogus- confession" issue and are very different from the case before us. In People v Tate, 87 Ill. 2d 134, 137-39, 429 N.E.2d 470, 472-73 (1981), there was direct evidence--eyewitness testimony--that defendant robbed a Food Mart. A "close friend of defendant['s]" testified that a third party had told him that the third party had been the robber but at trial, the third party denied the statement. "Bogus confessions" present a real problem to the administration of justice. If all a defendant needs to do to escape conviction is find a friend who will testify that a third party confessed to the crime, many trials will end in shambles. The direct evidence in Tate is what distinguishes that case from our case. If the case against the Tate defendant had consisted solely of an unsupported confession, which the defendant denied making, surely the fact that another individual had allegedly made a similar confession would have been admitted substantively, and the other individual's conviction for a similar offense would also have been admitted.

I also disagree with the trial court that there was no Napue violation. See Napue v. Illinois, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177 (1959) (even where the prosecution did not solicit false testimony, but allows it to go uncorrected when it appears, due process is violated). A critical question in this case was whether defendant made phone calls from his home at 10:37 and 10:39 a.m., after leaving the bank at 10:11 a.m. If defendant was still in Rockford at 10:37 a.m., he could not have been in

Normal at noon. Detective Freesmeyer testified that he timed the trip at 31 minutes, meaning that defendant could not have been home until 10:42 a.m. The prosecutor, arguing to the jury, conceded that it was theoretically possible that defendant could have made the calls; he could have been speeding. The prosecutor continued, however, that "it is very highly unlikely" that defendant made the calls. "You remember we timed that route, too. Detective Freesmeyer drove that in 31 minutes in the middle of a busy day." The prosecutor told the jury that defendant could not have made the calls if he had been driving reasonably. That was misleading. Detective Freesmeyer had driven from the bank to the home in 25 minutes and he had discussed that fact with the prosecutor, although it was not mentioned in his police report. At the postconviction hearing, Freesmeyer testified that defendant could have made the phone calls. A defendant's right to a fair trial is violated when a prosecutor allows misleading testimony to be presented to a jury.

It is problematic when the State relies on evidence of motive and opportunity to prove guilt. A defendant may have both motive and opportunity and still be innocent of the crime. For that reason, the State is required to prove not just that defendant had motive and opportunity, but that no one else had the opportunity to commit the crime. Dowaliby, 221 Ill. App. 3d at 797-98, 582 N.E.2d at 1248-49. John Doe could have committed this crime. A complete stranger could have committed this crime. It was the prosecution's burden to disprove those possibilities. See Dowaliby, 221 Ill. App. 3d at 801, 582 N.E.2d at 1251 ("an intruder could have entered the house on the evening of Jaclyn's disappearance and murdered Jaclyn"). Instead, the prosecution convinced the trial court not to allow any mention of John Doe, misrepresenting that Doe was not a viable suspect. This conviction should be reversed and the cause remanded.