2019 IL App (1st) 170468-U

No. 1-17-0468

Order filed December 31, 2019

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 5504 |
| | ) | |
| BOBBY MINOR, | ) | Honorable |
| | ) | Mary M. Brosnahan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HALL delivered the judgment of the court.
Justices Rochford and Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's convictions where the trial court properly denied his motion to quash arrest and suppress evidence.

¶ 2    Following a jury trial, defendant Bobby Minor was convicted of armed violence (720 ILCS 5/33A-2(a) (West 2012)), possession of a controlled substance with intent to deliver more than 100 grams but less than 400 grams of cocaine (720 ILCS 570/401(a)(2)(B) (West 2012)), and being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2012)). He was sentenced to

consecutive terms of 15 and 9 years' imprisonment, as well as a concurrent term of 6 years' imprisonment. On appeal, defendant argues the trial court erred in denying his motion to quash arrest and suppress evidence because the search of defendant's car was illegal. We affirm.

¶ 3 Defendant was charged with one count each of armed violence, possession of a controlled substance (cocaine) with intent to deliver, armed habitual criminal, and two counts of unlawful use or possession of a weapon by a felon, all arising from recovery of a loaded firearm and drugs during police officers' search of defendant's car on February 23, 2013, following a traffic stop. Defendant filed a motion to quash arrest and suppress evidence, arguing his conduct prior to his arrest could not reasonably be interpreted by the arresting officers as constituting probable cause that he had committed or would commit a crime, and his arrest "was made without a valid search or arrest warrant" in violation of the fourth amendment.

¶ 4 At the hearing on the motion, defendant testified that, on February 23, 2013, at approximately 8:00 p.m., he was driving in his car, wearing his seat belt. At 116th Street and Indiana Avenue in Chicago, a police car pulled defendant over. Defendant rolled down his window to speak with the officer. The officer told defendant there had been a shooting in the area, defendant was driving by, and police wanted to search the car. He asked defendant to get out of the car. Defendant asked why, but the officer kept insisting he get out of the car so defendant asked to speak to a sergeant. The officer never asked for defendant's license and insurance, although defendant offered "it" numerous times. After "going backwards and forth" with the police officers, they "pulled out their firearms" and told defendant with "more aggressiveness" to get out of his car. Defendant then got out of his car and the officers took him "back" to another car and told him

to stand there. The officers searched his car, where they recovered a gun and "some drugs." Defendant knew nothing about "the seat belt ticket until later on."

¶ 5 On cross-examination, defendant stated he did not argue with the officers when they approached, but asked them why they pulled him over. Defendant had his hands on the steering wheel, and the officers never told him to show them his hands. Defendant acknowledged he argued with a police officer about getting out of his car, but stated he cooperated with the officer "until he told *** [defendant] to get out of the vehicle." The officers did not have their guns unholstered as they approached defendant's car. Defendant asked for a sergeant because he did not understand why he needed to get out of his car if a shooting had taken place in the area. The conversation lasted approximately two minutes before the officers unholstered their weapons.

¶ 6 Chester Stewart, defendant's father-in-law, testified he was walking down Indiana Avenue from 114th Street to 118th Street on the day in question when he saw police officers stop a "white car." One police officer "got" the driver, defendant, out of his car and the other officer searched the car. Stewart "said to [himself], that's illegal." "[T]hen after that," Stewart saw the officers handcuff defendant and put him in a squad car.

¶ 7 The court denied the State's motion for a directed finding.

¶ 8 Chicago police officer Macario Chavez testified he was familiar with the area of 115th Street and Indiana Avenue, and knew the area had high gang activity. On February 23, 2013, Chavez saw defendant driving a vehicle at Indiana Avenue and Kensington Avenue without wearing his seat belt. It was dark out, but several street lights were at the corner, and there was nothing obstructing Chavez's view of defendant.

¶ 9 Chavez initiated a traffic stop and exited his vehicle, when he saw defendant reach into the right side of his waistband. Chavez yelled verbal commands "several times" to defendant to let Chavez see his hands. Chavez was "very close," right behind defendant's car, when he saw him reach for his waistband. As Chavez approached the driver's side window, which was down, defendant did not comply with his verbal commands, and Chavez saw him "reaching inside the center console as attempting to conceal something." As Chavez yelled the verbal commands to defendant, defendant did not show Chavez his hands, but rather "kept reaching inside the center console and then underneath the seat." Chavez was afraid for his and his partner's safety as defendant could have been concealing a weapon, and they were in a high crime area.

¶ 10 When Chavez was right next to defendant's door, defendant showed Chavez his hands, at which point Chavez asked defendant for his license. Chavez asked defendant to step out of the vehicle, but defendant refused until another unit arrived, approximately less than a minute later. Defendant stood with Chavez's partner, Officer Herrera, as Chavez searched the car. Chavez found a fully loaded semi-automatic nine-millimeter handgun inside the unlocked center console, where Chavez had observed defendant reaching when he approached the car. Chavez told his partner and defendant was placed in handcuffs. Chavez then observed a plastic bag protruding from underneath the driver's seat. The bag contained a white substance, suspect cocaine, along with several plastic baggies, two scales, and rubber bands along with a green leafy substance, suspect cannabis.[1] Chavez had also smelled the strong odor of cannabis in the car. Chavez issued a citation to defendant for failure to wear his seat belt.

---

[1] According to the complaint, the cannabis recovered from defendant's car was "not more than 2.5 grams," in weight.

¶ 11    On cross-examination, Chavez stated he wrote the police report on this case, and acknowledged the police report did not say anything about defendant with a weapon in his hands, or that Chavez smelled cannabis in the car. The bag with the drugs was in plain view, but Chavez acknowledged the police report stated he found it under the seat "on further inspection." Chavez did not recall whether there had been a shooting in the area on that date, but knew the area was a high crime area. Chavez had not seen defendant commit any crimes other than not wearing a seat belt. When he was speaking with defendant through the driver's side window, Chavez had a flashlight and did not see a gun in defendant's waistband, but asked him to get out of the vehicle because he saw defendant conceal something in the center console and, although he did not see what it was, feared it was a weapon. Defendant reached inside his pockets to take out his driver's license as Chavez was speaking with him. Defendant never asked for a sergeant.

¶ 12    On redirect examination, Chavez testified that the report he created was a summary rather than a verbatim account of the events.

¶ 13    In closing, defendant argued the search of his car was in violation of his fourth amendment rights, because the police officers had not seen him do anything suspicious. The trial court denied defendant's motion, finding the police officers had an appropriate reason to initiate a traffic stop, namely that defendant was not wearing a seat belt. Further, the trial court found the testimony from Chavez that he saw defendant reaching toward the right side of his waistband, the center console, and under the seat to be credible. In finding such testimony credible, the trial court found Chavez had "justification for a protective search of the limited passenger compartment area" limited to the areas in which a weapon could be placed.

¶ 14 At trial, the State proceeded with the charges for armed violence, possession of a controlled substance with intent to deliver, and armed habitual criminal. Officer Chavez testified that, on February 23, 2013, at approximately 8:00 p.m., he was on patrol with Officer Herrera. While on patrol, Chavez observed a man, identified in court as defendant, driving while not wearing a seat belt. Chavez followed defendant's car and activated the lights and siren in order to conduct a traffic stop. Defendant pulled over, and Chavez exited his car to approach defendant on the driver's side.

¶ 15 As Chavez approached, he observed defendant "making furtive movements to the right side of his waistband reaching inside the center console and then reaching down under the seat." Chavez yelled verbal commands to defendant to show his hands, but defendant refused to do so and continued making the "furtive movements." Chavez, "out of concern for [his] safety," unholstered his weapon and continued approaching defendant and asking defendant to show him his hands. Chavez asked defendant to step out of the vehicle several times, but defendant refused to comply, so Chavez requested additional officers to assist him. Two more police vehicles arrived, at which point defendant stepped out of the car. Chavez then reached inside the center console where he saw defendant "concealing what [Chavez] figured to be a weapon," and recovered a loaded nine-millimeter semi-automatic handgun. The gun was within "reaching distance" from where defendant had been sitting.

¶ 16 Once he recovered the gun, Chavez told his partner "gun, gun, gun," and saw his partner put handcuffs on defendant. Chavez then looked under the driver's seat where he had also seen defendant reaching, and recovered two large clear plastic bags containing a white substance, suspect cocaine, another plastic bag containing multiple clear Ziploc baggies, along with two scales and rubber bands. Defendant was then placed under arrest and transported to the police

station. At the station, after receiving his *Miranda* rights, defendant stated the gun was his, "for protection," and he "got the drugs from some Mexican Latin Kings" for $5000; defendant was "just suppose [*sic*] to pick it up and deliver it to [his] cousin in Indiana."

¶ 17    On cross-examination, Chavez stated when defendant stopped at the stop sign, he was directly to Chavez's left, and Chavez was able to see defendant was not wearing his seat belt. Chavez did not recall whether defendant told him he was looking for his driver's license while he was making the "furtive movements." Chavez never saw a gun or drugs in defendant's hands. Chavez saw defendant open the center console and reach inside, but could not tell what, if anything, was in defendant's hands at the time. Chavez never told defendant he was stopping people because there had been a shooting in the area recently.

¶ 18    On redirect examination, Chavez testified the cocaine he recovered was underneath the driver's seat. Asked whether it was "hidden," Chavez stated he took "a quick peek" and saw it. Chavez did not remember whether the cocaine was protruding out of the seat.

¶ 19    Chicago police officer Arnold Luevano testified that on February 23, 2013, he responded to Chavez's request for assistance. He arrived at the scene approximately two to three minutes after he heard the request, and saw defendant sitting in a car in the driver's seat. Approximately one minute after Luevano arrived at the scene, defendant got out of the car, Chavez handed him over to Luevano, who "proceeded" to place him in his police car. Luevano did not see anything recovered from defendant's car. At the police station, Chavez turned over evidence to Luevano, who inventoried the handgun, ammunition, magazine, and narcotics which had been recovered.

¶ 20    Tiffany Neal testified she was a forensic scientist with the Illinois State Police, and was declared an expert in the field of forensic chemistry by the court. Neal tested the white substance recovered from defendant's car, and determined it was 372.3 grams of cocaine.

¶ 21    The parties stipulated that defendant had previously been convicted of two felony offenses which satisfy the conviction element of the charge of armed habitual criminal. The court denied defendant's motion for a directed finding.

¶ 22    Kyra Minor testified she had been married to defendant for four years, and together they owned a Ford 500 car.[2] On February 22, 2013, the day before defendant was arrested, defendant's cousin Quincy had been operating that car, and Kyra drove it to her mother-in-law's house where defendant picked it up. When she did so, she did not look in the console or under the seat, and the gun and drugs found in the car were not Kyra's. On cross-examination, Kyra acknowledged that, after she discovered a gun and drugs were recovered from the car, she told police and an investigator from the Cook County State's Attorney's Office, Investigator Sarna, that they had arrested the wrong person, but did not tell them Quincy had the car the day before defendant was arrested.

¶ 23    Defendant testified that on February 22, 2013, he did not drive his Ford 500 car, but his wife and cousin, Quincy Terrell, both used it that day. Defendant got the vehicle back later that day and, when it was returned, he did not look inside the console or under the driver's seat.

¶ 24    Defendant testified that on February 23, 2013, at approximately 8:00 p.m., he was driving while wearing his seat belt and saw multiple police cars. After he passed a police car at a stop sign, it followed him and pulled him over. At that point, defendant reached into his back pocket to take

---

[2] Kyra Minor has the same last name as defendant, so we will refer to her here as "Kyra."

his wallet out for his driver's license, and reached into the console and glove compartment to look for the insurance card. Defendant had his license and insurance card in his hand when the officer came up to the car and offered them to the officer, but he did not want to see them. Defendant asked the officer what was happening, and the officer unholstered his gun and told defendant to get out of the car. The officer pointed the gun at defendant, so defendant got out of the car and was placed in the back of another police car. The officer told defendant there had been a shooting in the area, and defendant told him he did not have anything to do with it. When defendant was taken to the police station, he did not make any statement to the police and did not know there were drugs underneath his seat. There was no gun in the center console when defendant opened it to find his insurance card.

¶ 25     On cross-examination, defendant stated he never reached under his seat when he got pulled over by the police because he had his seat belt on, but was able to reach for the glove compartment. Defendant was shown the cocaine found underneath the driver's seat, and stated it "look[ed] like sugar," and it "ha[d] to be" his cousin's. Defendant was shown the gun, and stated he did not recognize it because it was not in the center console, but also "it ha[d] to be" his cousin's gun. When questioned about the statement he allegedly made at the police station, defendant stated he never made the statement and it "sound[ed] crazy" and "[did not] make sense." At the police station, once defendant learned about the gun and drugs in his car, he told the police officers about his cousin Quincy, and a sergeant told him there was nothing they could do, and defendant had to prove it in court. Neither defendant nor his wife had family in Indiana.

¶ 26     The State recalled Officer Chavez in rebuttal, who testified he never observed defendant go into the glove box of his car. When Chavez recovered the gun from the console, he yelled "gun,

gun gun," and defendant was approximately five feet away at the time. Chavez never pointed the gun at defendant.

¶ 27    On cross-examination, Chavez stated defendant was placed into the back of Officer Luevano's police car when Chavez had already recovered the gun. Chavez recalled that, once the gun was recovered, defendant was walked to the backseat of the police car. Chavez then recovered the narcotics, and showed both the gun and narcotics to defendant. Chavez had unholstered his weapon "for [his] safety."

¶ 28    The State also called Chicago police officer Asahi Hayden in rebuttal, who testified her partner was Officer Luevano. On February 23, 2013, she responded with Luevano to the scene to assist Chavez. Hayden saw defendant exit his car and move behind the vehicle. Chavez then inspected the driver's area of the car, and alerted his partner to the presence of a gun by saying "gun, gun, gun." After the weapon was recovered, defendant was placed in handcuffs and detained. Hayden also observed Chavez recover suspect narcotics from the car.

¶ 29    Defendant renewed his motion to quash arrest and suppress evidence, arguing Luevano placed defendant into a police car before the search and had no probable cause to arrest him, and there was nothing in the record which showed any reason for Chavez to be afraid for his safety, given defendant was pulled over for a petty offense. The trial court considered the evidence heard during the suppression hearing and the trial. It acknowledged the conflict between the testimony of Luevano and Chavez with regard to where defendant was standing when the gun was recovered, noting Hayden's testimony corroborated Chavez, but found the "real issue" was the observations Chavez made as he approached the car. The court denied the renewed motion, finding the

testimony it heard regarding the furtive movements Chavez witnessed "credible", and "at the time, what's known to the officer is get him out of the car."

¶ 30    The State presented one last rebuttal witness, Mary Sarna, who testified she was an investigator for the Cook County State's Attorney's Office and spoke with Kyra Minor. Kyra never told Sarna that the drugs found were not the defendant's drugs, defendant was the wrong person, or anything about Quincy Terrell. If Kyra had told her the State was prosecuting the wrong person, Sarna would have documented it in her report and reviewed it with the State's Attorney.

¶ 31    The jury found defendant guilty of possession with intent to deliver 100 grams or more but less than 400 grams of a substance containing cocaine, armed violence, and being an armed habitual criminal. The trial court denied defendant's motion for a new trial, noting it was not going to reconsider the ruling on the motion to quash arrest and suppress evidence. The case proceeded to sentencing, and the court sentenced defendant to 15 years' imprisonment for the armed violence count, consecutive to 9 years' imprisonment for the possession count, concurrent to 6 years' imprisonment for the armed habitual criminal count. The court denied defendant's motion to reconsider sentence.

¶ 32    On appeal, defendant argues that this court should reverse the denial of his motion to quash arrest and suppress evidence where the search of defendant's car was illegal because mere claims of "furtive movements," without more, do not support a reasonable inference that a person is armed and dangerous. Defendant also contends Officer Chavez's testimony was not credible and "highly contradictory," arguing Chavez's testimony that he could see defendant reaching into his waistband from outside the car and inconsistencies in his testimony regarding finding the drugs undermine his overall credibility. Defendant asserts that, because none of his convictions can stand

without the evidence obtained through the search of the car, this court should reverse his convictions outright.

¶ 33    We review rulings on motions to quash arrest and suppress evidence under a two-part standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). First, a trial court's findings of fact should be reviewed for clear error and will only be reversed if they are against the manifest weight of the evidence. *Id*. "A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted." *Id*. Accordingly, we review the trial court's legal ruling as to whether suppression is warranted *de novo*. *Id*.

¶ 34    Under the fourth amendment to the United States Constitution, people have the right to be secure against unreasonable searches and seizures. U.S. Const., amend. IV. Under *Terry v. Ohio*, 392 U.S. 1, 27 (1968), the United States Supreme Court held that, during an investigatory stop, an officer may conduct "a reasonable search for weapons for the protection of the police officer, where he has a reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27; see *People v. Close*, 238 Ill. 2d 497, 505 (2010) (noting this court follows the principles set forth in *Terry v. Ohio*). The officer does not need to be "absolutely certain" the individual is armed, and the issue is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*

¶ 35    In determining whether the officer acted reasonably, we must give weight to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience, not to any "inchoate and unparticularized suspicion or 'hunch.'" *Id*. A protective search under *Terry* may

extend to a search of the passenger compartment of an automobile "limited to those areas in which a weapon may be placed or hidden," if the police officer possesses a reasonable belief based on specific and articulable facts, taken together with reasonable inferences from those facts, that the suspect is dangerous and may gain immediate control of weapons. *Michigan v. Long*, 463 U.S. 1032, 1049 (1983); see *People v. Colyar*, 2013 IL 111835, ¶ 38 ("Explaining its decision, the *Long* court noted that roadside encounters are 'especially hazardous,' and a police officer may reasonably believe that he is in danger from the possible presence of accessible weapons inside the vehicle.")

¶ 36 We review *Terry* stops under a two-part test: first, we consider whether the officer's action was justified at its inception (*People v. Moss*, 217 Ill. 2d 511, 527 (2005)) and, second, we consider whether the investigating officer had a reasonable belief that the defendant was armed and dangerous (*People v. Jackson*, 2012 IL App (1st) 103300, ¶ 19). When reviewing an officer's actions, this court applies an objective standard to decide whether the facts available to the officer at the time of the incident would lead an individual of reasonable caution to believe the action was appropriate. *Colyar*, 2013 IL 111835, ¶ 40. The court analyzes these actions based upon the totality of the circumstances. *Moss*, 217 Ill. 2d at 527. "Although we must apply an objective standard, 'the testimony of an officer as to his subjective feelings is one of the factors which we may consider in the totality of the circumstances known to the officer at the time of the [search]." *People v. Johnson*, 2019 IL App (1st) 161104, ¶ 20 (quoting *People v. Galvin*, 127 Ill. 2d 153, 168 (1989)).

¶ 37 Defendant does not challenge the stop of his vehicle, as he was stopped for not wearing his seat belt, a traffic violation, and, therefore, the stop was valid at its inception. See *Moss*, 217 Ill. 2d at 527 (A vehicle stop based on the observation of a traffic violation is valid at its inception).

Rather, defendant contends Chavez's subsequent search of his car, premised on Chavez's belief defendant had a firearm, was illegal. He argues Chavez's only reason to believe defendant was armed and dangerous was his observation of defendant's alleged furtive movements in the car, which this court has held as insufficient to justify a protective search of a vehicle. See *People v. Smith*, 2015 IL App (1st) 131307, ¶ 36. Defendant also contends Chavez's testimony regarding his observations of defendant was incredible, where he claimed he was able to see defendant reach into his waistband from outside the car in the dark and Chavez's testimony regarding his viewing the drugs under defendant's seat was contradictory and his testimony that he smelled "a strong odor of cannabis" as defendant opened his car door is not plausible given the small amount of cannabis recovered.

¶ 38    First, defendant's contention regarding Chavez's credibility is nothing more than a request for this court to reweigh the evidence, resolve conflicts in the testimony, and determine the credibility of the witnesses. As the reviewing court, we refuse to do so.  On questions of fact and witness credibility, this court will exercise deference to the trial court, only reversing if the court's conclusions are against the manifest weight of the evidence. *People v. Sims*, 358 Ill. App. 3d 627, 634 (2005). Here, the trial court heard Chavez's testimony at both the suppression hearing and at trial. It also heard defendant's argument regarding inconsistencies in that testimony regarding whether he saw the drugs in plain view, and challenging Chavez's claim that he saw defendant reach into his waistband, and hide "something" in the center console of the vehicle. During the ruling on the renewed motion to quash arrest and suppress evidence, the court specifically noted inconsistences between Chavez's and Luevano's testimonies regarding where defendant physically was when Chavez searched his car. Yet the trial court ultimately found Chavez to be

credible. We must accord great deference to the trial court's factual findings and cannot substitute our judgment for that of the trial court, and do not find the trial court's determination that Chavez was credible to be against the manifest weight of the evidence. See *id*.

¶ 39    We also find Chavez had a sufficient basis to search defendant's car based upon the totality of the circumstances. "[M]ovements taken alone are insufficient to constitute probable cause to search since they may be innocent," but "furtive movements may be considered justification for performing a warrantless search when coupled with other circumstances tending to show probable cause, looks, gestures." *People v. Creagh*, 214 Ill. App. 3d 744, 747-48 (1991) (citations omitted). Despite defendant's contentions, the evidence shows Chavez relied on more than mere furtive movements as a basis to search defendant's car.

¶ 40    Chavez testified that, in addition to the furtive movements he observed defendant make from his waistband to the central console and underneath the driver's seat, he told defendant multiple times to show Chavez his hands, and defendant refused to comply. This prompted Chavez to unholster his weapon "[o]ut of concern for [his] safety." After this, defendant did not comply with Chavez's request to exit the car until Chavez called for assistance, and defendant admitted during the suppression hearing he "argued" with Chavez regarding getting out of his car. Chavez testified multiple times that he was concerned about his safety and that of his fellow officers during this interaction. Further, Chavez testified during both the suppression hearing and at trial that he stopped defendant's car in a high-crime area. See, *e.g.*, *Jackson*, 2012 IL App (1st) 103300, ¶¶ 41-44; 51 (holding the officers had a reasonable concern about their safety to justify a frisk of defendant where the record showed defendant was engaged in suspicious and "bizarre" behavior, coupled with his presence in a high-crime area.) Given the high-crime area where the traffic stop

occurred, and defendant's refusal to show Chavez his hands, while he apparently concealed an unidentified item in the center console of the car, we find Chavez had a reasonable belief that defendant was armed and dangerous to justify his search of the car. See *Long*, 463 U.S. at 1050 (considering the time of night and location of the traffic stop as factors to consider in determining whether police had a reasonable belief defendant posed a danger if permitted to reenter his vehicle).

¶ 41     Defendant argues extensively that he could have been reaching for his wallet and insurance card in the center console and at his waist. However, the trial court heard conflicting testimony from both Chavez and defendant concerning defendant's hand movements during the traffic stop, and found Chavez's version of events credible. At the suppression hearing, defendant testified that, during the traffic stop, he kept his hands on the steering wheel. However, at trial, he testified he had reached into his pocket, center console, and glovebox to find his driver's license and insurance card, which he had in his hands when Chavez approached. In contrast, Chavez testified during the suppression hearing, that he saw furtive movements while he was approaching, did not see defendant reach for the glove compartment, and saw defendant take his driver's license from his pocket when Chavez was speaking to him. Again, we will not substitute our judgment for that of the trial court's regarding its factual findings including the credibility of witnesses and the reasonable inferences to be drawn from the facts. See, *e.g.*, *Sims*, 358 Ill. App. 3d at 634. We find it a reasonable inference that Chavez could believe defendant was making movements toward something other than his driver's license and insurance card as Chavez approached the car.

¶ 42     For the reasons set forth above, we affirm the trial court's decision to deny defendant's motion to quash arrest and suppress evidence, and, accordingly, affirm defendant's convictions.

¶ 43     Affirmed.